No. 3598

Second Circuit

---

SEARS v. INTERURBAN TRANSP. CO., INC.

(UNION INDEMNITY CO., Warrantor)

---

(January 31, 1930. Opinion and Decree.)
(March 24, 1930. Rehearing Refused.)
(May 5, 1930. Writ of Certiorari and Review Refused by Supreme Court.)

---

White, Holloman & White, of Alexandria, attorneys for plaintiff, appellee.

Hawthorn, Stafford & Pitts and Overton & Hunter, of Alexandria, attorneys for defendants, appellants.

DREW, J. George E. Sears, the plaintiff, vendor of busses, and N. W. Walker, pres-

ident of the defendant, Interurban Transportation Company, Inc., buyer and user of busses, arranged an automobile trip into Mississippi for the purpose of establishing a bus line in that state and with the view of Sears selling the defendant company the busses it would use in that venture. Accordingly, about noon of February 19, 1928, Mr. Walker left Alexandria, La., in a Chrysler coupe belonging to the defendant, and drove to Natchez, Miss., where, by prior understanding, he met the plaintiff. About the hour of 4:30 the following afternoon, with Walker at the wheel, they drove the Chrysler 117 miles to Jackson, Miss., arriving there at about 8:15 p. m. The following morning, with Walker driving, they proceeded as far as Hattiesburg, Miss., where they both got out of the car. On resuming the journey, plaintiff took the wheel, to relieve Walker of the strain of driving. Sears had driven the car 12 or 15 miles out of Hattiesburg, with New Orleans as the ultimate destination, when he reached the summit of a hill, the descent of which stretched before him approximately 700 yards. As he proceeded down the hill, he observed, parked about the bottom of the descent, a Ford automobile, standing on its left, or wrong side of the road, and apparently deserted. When within a distance of 150 feet from said Ford car, plaintiff, having eased over to the left of the center of the road, in order to pass the Ford, the Ford started, and proceeded towards its right of the road. Sears had reduced his speed from 35 miles an hour, at the summit of the hill, to approximately 25 miles an hour, at the time the Ford started up.

Plaintiff turned the car to the right, to miss the Ford, and headed towards the embankment, which was 6 or 7 feet high at that point of the road, and, to avoid going off the embankment, he turned the car sharply towards the left again, and headed towards the Ford. In order to miss the Ford, he headed it again towards the right, and succeeded in passing the Ford without hitting it. He again turned to the left and then to the right at least twice, after passing the Ford, each time going perilously near the embankment on each side. Finally the right rear wheel went over the embankment, and the car traveled practically sideways for a distance of 20 or 30 feet, when it turned completely over, and righted itself on all four wheels.

Plaintiff was seriously injured in this accident, and instituted this suit against the defendant for the sum of $9,500, alleging that the car he was driving was the defendant's car, and that it was defective in its steering gear, or in some manner that affected the steering, that the defendant knew of the defect, but that plaintiff did not know of it prior to the accident, and that the defect was the cause of the accident.

Defendants deny that the car was defective as alleged, and aver that, if there was any peculiarity about the car, it was known to plaintiff; they deny negligence on the part of defendant, Interurban Transportation Company, Inc., and plead contributory negligence on the part of plaintiff, in that he was driving at a reckless rate of speed going down hill, where the car was likely to skid in loose gravel, and in approaching a car parked on the wrong side of the road at an excessive speed.

Defendant Interurban Transportation Company, Inc., called its insurer, Union Indemnity Company, in warranty, to defend the suit.

The warrantor urges the same defense as the defendant against the plaintiff, and denied the right of the defendant to hold it liable on the policy.

The case was tried without a jury, and the lower court rendered judgment in favor of plaintiff in the sum of $5,000, from which judgment both defendant and warrantor have appealed.

This particular car had been in a wreck in December, and some part of the steering apparatus had been damaged, which was fixed by defendant and paid for by warrantor herein, and the day before this trip Walker, president of the defendant company, had told plaintiff that the car did not steer properly, that the steering gear was not in proper shape, and that he would either have the car fixed or would bring his wife's car on this trip. The car was worked on by defendant's mechanics the evening before the trip, and the repairs to the car amounted to putting what are known as "shims" in the front axle. The "shims" were put in to prevent the car from "shimmying" but caused the car, when making short curves, to turn too quickly, to be too quick in action. They did not have any effect of this kind in ordinary driving or in taking an ordinary curve, but that in short, quick turns, as were necessary at the time of the accident, the car would turn too quick; that is, go too far to the right or left, as the case might be.

When Mr. Walker left Alexandria in the car, he was told by his mechanics that the car had been fixed, and he had reason, at that time, to believe the car was in good shape; but he testifies that, before he reached Natchez, he discovered that there was a peculiarity about the steering; that the car cut quickly, more so than the ordinary car, and cut quicker than it did before the mechanics worked on it. He attributed this peculiar steering to the fact that, in order to remove the "shimmy" from the wheels, the axle had been "shimmed" up; in other words, they had put some pieces of tin, or something of the kind, between the axle and the spring, which would give the axle more pitch, and that this naturally makes a car respond more quickly. He said he did not know whether you could consider it tricky or not, but it might be; that it was peculiar in a way; that it cut quickly.

The fact that the car would cut too quick on a sudden turn, is shown conclusively by witnesses for both plaintiff and defendant.

This was known to Mr. Walker, who did not inform the plaintiff of this peculiarity of the car. Plaintiff had never driven this car before, and had no knowledge of its defects or peculiarities.

The uncontradicted testimony of Sears is as follows:

"Q. What, if anything, did Mr. Walker say about the steering gear being defective or out of line?

"A. He didn't say anything about it.

"Q. What objection, if any, did he make to your taking the wheel?

"A. Well, as we came out of the barbershop of the Hattiesburg hotel the car was parked directly in front, and I walked around to the driver's side, and Mr. Walker said: 'You better let me handle it,' and I said, 'Well, you are tired, been driving, and I know these roads thoroughly'; because previously that was my territory, and I had been up and down the road a number of times.

"Q. Did he make any objection to your taking the wheel, other than that?

"A. No, sir.

"Q. Say anything further about the car steering badly or improperly?

"A. No, sir.

"Q. Did he at any time caution you as to driving?

"A. No, sir."

Mr. Walker's testimony on this point is interesting:

"Q. Haven't you driven with Sears a good many times before?

"A. Well, I had driven with Mr. Sears

some before; don't know just how many times.

"Q. Your hesitancy in his taking the wheel this time, was that just normal hesitancy, or wasn't it because you thought th₂ car tricky or unusual?

"A. Well, I couldn't hardly say. I suppose I had some feeling about the car; the particular car.

"Q. Didn't you think it was more dangerous than usual to drive this car?

"A. Well, with a car turning quickly at a touch that way, it would probably be more dangerous for him than it would be for me.

"Q. Well, didn't you feel that when he took the seat; wasn't that the reason you hesitated about that?

"A. Well, I had some feeling along that line, and would naturally feel that way if any one took the car to drive it.

"Q. Didn't you feel more than usual at that time?

"A. I had a hesitancy about letting him drive it, but object. I didn't want him to drive it, but as I remember, I didn't chime in with him when he agreed to drive it.

"Q. You didn't call his attention to the cutting too far or responding peculiarly as you state?

"A. No, sir.

"Q. You didn't call his attention to the peculiarity of the car, did you?

"A. No, sir—I didn't."

Plaintiff was an experienced automobile driver, and defendant contends that he had been driving the car 12 or 15 miles and had watched Walker drive for 200 miles on this same trip, and therefore he should have discovered the peculiarities of the car. Sears states that he had noticed no peculiarity in the steering until the occasion came to cut suddenly; and Walker testified as follows:

"Well, I don't think there was anything noticeable about the car not steering properly, because we had no chance of anything that looked like an accident."

Defendants contend that the testimony of Mr. Walker should be taken with caution, for the reason that his liability is fully protected by the insurance company and he and plaintiff are good friends. This might be true ordinarily, but in this case the insurance company is not assuming liability, but denies its liability to defendant if the accident should be held to have been caused by a defect in the steering part of the car; therefore any admission by Walker against his interest will be given due credit, the same as though his liability was not insured.

The preponderance of evidence is that the car would cut too quickly and too far, when it became necessary to make a sudden turn, and was, to that extent, a tricky car; that defendant had knowledge of this defect and did not impart that knowledge to plaintiff.

Was this defect of the car the cause of the accident?

There were three eyewitnesses to the accident—Sears, Walker, and the driver of the Ford car—all of whom testify that the road was good, a highway 35 feet wide, smooth, no ruts, and no loose gravel to amount to anything, and that the situation was not dangerous until the Chrysler began cutting backwards and forwards across the road; that there was plenty of room for it to pass the Ford, and that it did actually pass the Ford without any collision; that plaintiff was not driving at an excessive rate of speed, but was driving in a safe and normal manner. The driver of the Ford testified that he saw plaintiff's car as it came over the hill. Therefore the blowing of the horn would have been a useless thing to do.

If the Chrysler had not cut too quickly and too far when plaintiff first cut to the right, there can be no doubt that plaintiff would have gone past the Ford without any further turning; and certainly after plaintiff passed the Ford there was no oc-

casion for the Chrysler to continue to cut back and forth across the road, unless it was due to the defect in steering. Plaintiff was an experienced automobile driver, having driven cars since 1910, and not shown to be excitable or nervous in disposition, and the reasonable conclusion is that, if it had not been for the tricky steering of the Chrysler, he would have been able to have righted the car, even after having passed the Ford, and prevented the accident.

Plaintiff believes that the tricky steering of the Chrysler was the cause of the accident, and Mr. Walker undoubtedly believes the same, as is shown by his admissions after the accident.

He told Sears a short time after the accident that he should not have let him drive the car because the steering gear was not right on it; that it had been worked on and he thought it was fixed, but it was not —still in bad condition.

Walker told Wingate Battle of his regret of the accident and of his close friendship for plaintiff, and, but for a defective steering apparatus, the accident would not have occurred. He also told C. E. Beard that Sears got behind the wheel on leaving Hattiesburg; that Sears was talking quite a bit, and he (Walker) was doing most of the listening; that he had the steering gear worked on the night before in Alexandria, and thought it was fixed, but found it was not fixed, and that he had in mind to caution Sears regarding the steering gear on several occasions, but, as Sears was talking, he did not interrupt him, as everything was going all right.

Mr. Boyd, driver of the Ford, testified that the wheels of the Chrysler were wobbling very badly, and the wobbling was not due to the driver handling the steering wheel. This was just before the accident.

We are convinced that the tricky condition of the Chrysler was the cause of the accident.

Defendants plead contributory negligence, and the burden of proof is on them to show plaintiff was guilty of such negligence. Buechner v. New Orleans, 112 La. 599, 36 So. 603, 66 L. R. A. 334, 104 Am. St. Rep. 455; Mequet v. Algiers Mfg. Co., 147 La. 364, 84 So. 904.

The defendants have failed to meet that burden, as the evidence clearly shows and is uncontradicted that plaintiff was driving at a normal rate of speed, and that there was no apparent danger until after the Ford started, and that plaintiff acted as any prudent man would have done under the circumstances when he cut his car to the right to avoid a collision with the Ford. Potter v. Glassell, 146 La. 687, 83 So. 898.

Any negligence shown on the part of the driver of the Ford car could be of no avail to defendant, for, when the negligence of defendant is shown, the fact that a third person was also guilty of negligence which contributed to the injury of the plaintiff, will not relieve the defendant from liability for its negligence. Huddy on Automobiles (8th Ed.) p. 364; Shield v. F. Johnson & Sons Co., 132 La. 773, 61 So. 787, 47 L. R. A. (N. S.) 1080; Churchill v. T. & Pac. Ry. Co., 151 La. 726, 92 So. 314.

We cannot imagine any defect in an automobile that would render it more dangerous than a defect in its steering apparatus, for, when one loses control of the direction the car will take, he is in the power of a dangerous machine, and in the present day, when all highways are filled with automobiles, driven by both skilled and unskilled drivers, even to children of tender years, when the deaths from automobile accidents run into the thousands yearly, not counting the other thousands who are

injured in automobile wrecks, most of which could be avoided, and our court dockets are crowded with damage suits arising from such accidents, such an emergency as faced the plaintiff in this case cannot be classed as an extraordinary danger not to be reasonably anticipated, for it is nothing unusual for a car to have to turn suddenly to the right or left to avoid a collision with another car, and a car so defective in its steering as to be unsafe at such a time is a dangerous machine, and it is negligence to allow it to be driven on the highways by others, and gross negligence for the owner with such knowledge of its defects to allow another to drive the car without informing him of the defects.

Plaintiff and Mr. Walker, president of defendant company, made the trip into Mississippi for the purpose of investigating the proposition of putting in a bus line by the defendant company and plaintiff hoping to sell to defendant the necessary busses to operate said line. The car was owned by defendant company and was in charge of its president, who had complete control of said car, and right to forbid plaintiff to drive the car, and it is not shown that plaintiff had any control over the use or manner of use of said car. Walker at least owed to the plaintiff ordinary diligence, and the defendant is responsible for ordinary neglect. Cody v. Venzie, 263 Pa. 541, 107 A. 383.

In Joyce v. Brockett (1923) 205 App. Div. 770, 200 N. Y. S. 394, it was held that liability may not rest upon the driver of an auto because of the failure of the brakes to hold when going down a hill, where the failure to work was unexpected and where upon the same trip it had worked properly while descending a number of hills, and where the brake shoe had been adjusted two or three days before the accident.

And it is stated in Mitchell v. Raymond, 181 Wis. 591, 195 N. W. 855, that there is no intention to limit or withdraw anything that has been said heretofore in such cases as Greenfield v. Miller, 173 Wis. 184, 180 N. W. 834, 12 A. L. R. 982, and O'Shea v. Lavoy, 175 Wis. 456, 185 N. W. 525, 20 A. L. R. 1008, or to qualify the rule thereby recognized, namely, that the guest who comes upon the premises or enters a vehicle of another must take such premises or vehicles as he finds them, and as it pleases the owner, in the exercise of his right of dominion over his own property, to maintain the same, provided, of course, such owner does not fail in his duty of informing or warning the guest of that which might be considered a trap or concealed defect, or by no act of his create a new danger. 40 A. L. R. 1344.

The general rule is that, where an owner of an automobile knows of its defects and allows another to drive it without warning him of its defects, which are unknown to the driver, he is guilty of negligence and liable for whatever damage is caused by accident in which the defect of the car was the cause.

In the case of Joyce v. Brockett, heretofore cited, the defendant had his brake fixed and had no knowledge that it was not in good shape, in that manner distinguished from this case.

In case of O'Shea v. Lavoy, 175 Wis. 456, 185 N. W. 525, 20 A. L. R. 1008, the original defective part of the car was not what caused the accident, the part that had been repaired was not what gave way, and defendant could not have had any more knowledge of its weakness than the plaintiff.

In Hennig v. Booth, 132 Atl. 294, 4 N. J. Misc. Rep. 150, 47 A. L. R. 332, the defend-

ant did have knowledge of defect in accelerator, and for injury to guest caused by said defective accelerator was held liable in damages.

· Other cases cited by defendant and warrantor are distinguished from the present case, in that defendant herein did have knowledge of defect in steering of car and failed to warn plaintiff.

The plaintiff has made out his case with a preponderance of evidence, and is entitled to judgment against defendant for damages for injuries received in the accident.

The injuries received by plaintiff are described by Dr. Allen as follows:

"Suffering with multiple contusions of the body and lacerated wounds of right knee joint, opening the joint, and contusions and lacerated wounds of the left side of the face made by some sharp instrument, which severed the soft parts, passed through the superior maxillary bone and entered the nasal cavity. Those two wounds to the knee and face were the most serious. There were other minor injuries."

He was confined to the hospital in New Orleans from February 21st to May 12th, and suffered great pain due to the treatment necessary. His pain was so great that it was necessary to give him opiates during that time. It was necessary for him to remain in one position in bed for nearly 60 days, as the attention to the knee consisted of immobilization and extension. Dr. O'Kelly, nose and throat specialist, attended him on a number of occasions for the nasal injury. His treatment was very painful. The seventh nerve, which is the motor nerve of the muscle of the face, was severed, resulting in some deformity of the face, made noticeable in any change of expression. It is a permanent disturbance of a paralytic nature. After he left the hospital, he received treatment at home from Dr. Allen and Miss Sue Price, a professional masseuse, each treatment causing him great pain. There is considerable stiffening and limitation of motion in the knee joint, 30 per cent disability in the range of motion. They are permanent.

Plaintiff was engaged in the automobile business, and, in order that he might drive a car, it was necessary to have a special seat constructed for him, due to the injury to his knee, which prevents the free movement of his leg.

Plaintiff's expenses during confinement on account of said injury, including hospital bills, doctor's bills, and nurse's bills, amounted to more than $2,000, his loss in earning for 1928 are shown to be in excess of $2,000, and we do not think a judgment for $7,500 is too much in this case.

Warrantor denies liability to the defendant under the policy of insurance for the reason that the steering gear on the same car was damaged in a wreck in December prior to the accident involved in this case and defendant fixed same in its own shop, presented bill for labor to warrantor, which was paid, and that, by undertaking to repair the steering gear itself, defendant was responsible for its failure to properly repair it, and relieved warrantor of liability for faulty repairs. It was not established that the repair work done by defendant was faulty or that the same damage to the steering gear existed at the time of this accident as did in December prior. To the contrary, the testimony is that the thing that caused the car to be so very tricky on the day of the accident was the shims that were put in said car the day before the Mississippi trip.

We do not think the warrantor's defense to its liability under the policy of insurance held by defendant is well founded.

The only remaining question in this case

is $750 claimed by defendant against warrantors as attorney's fees, alleging that defendant was forced to employ attorneys to defend this action after warrantor had refused to defend said suit without reserving its right to contest its liability to defendant in case judgment was rendered against defendant. There is no contest over the fact that the policy of insurance calls for all expenses incurred in defending such claims as this present suit, or that insurer is obligated to defend all such actions for the insured. Warrantor claims it was willing to defend the suit with such reservation, and that it was entitled to do so.

The policy reads as follows, in part:

"If thereafter any suit is brought against the assured to enforce such a claim for damages, the assured shall immediately forward to such Executive Office of the Company every summons or other process, and the Company will defend such suit, whether groundless or not; the expenses incurred by the Company in defending such suit, including court costs and all interest accruing after entry of judgment, will be borne by the Company," etc.

Defendant complied with the policy in every respect, and, when warrantor refused to defend the suit without reservations, defendant was forced to employ attorneys to look after its interest, and same is a just expense incurred by the defendant in defending the suit. Warrantor is now before this court denying liability to defendant which would in itself require defendant to employ counsel to represent it.

We see no merit in warrantor's contention. The lower court rendered judgment in favor of defendant against warrantor in the sum of $750, over which amount there is no contest, and we see no reason for disturbing that judgment.

It is therefore ordered, adjudged, and decreed that the judgment of the lower court be amended by increasing the amount of judgment rendered in favor of plaintiff, George E. Sears, and against the Interurban Transportation Company, Inc., from $5,000 to $7,500, and, as so amended that the judgment of the lower court be affirmed; costs of both courts to be paid by appellants.