135 So.2d 507 (1961)
Clifton C. PHARES, Plaintiff-Appellee,
v.
Thomas G. BIGGS, M. D., and The Travelers Insurance Company, Defendant-Appellant.
No. 9590.
Court of Appeal of Louisiana, Second Circuit.
November 22, 1961.
Rehearing Denied December 27, 1961.
Certiorari Denied February 2, 1962.
*508 Theus, Grisham, Davis, Leigh & Brown, Monroe, for appellant.
Voelker & Ragland, Lake Providence, for appellee.
Before HARDY, AYRES and BOLIN, JJ.
HARDY, Judge.
This is an action for damages claimed by plaintiff as the father of a thirteen-year old daughter, Margie Dian Phares, who was fatally injured when struck by an automobile driven by the defendant, Dr. Biggs, whose liability insurer was named as a co-defendant. From judgment in favor of plaintiff the defendants have appealed.
The tragic accident occurred on Highway 2 in a rural section of East Carroll Parish between 5:30 and 6:00 o'clock on the evening of November 6, 1960. The time was during that period best described as "dusk-dark", when visibility is low and vehicle headlights are least effective in illuminating the roadway.
The highway at the point of the accident is a two-lane blacktop thoroughfare twenty-four feet in width with gravel shoulders extending approximately ten feet on each side. Shortly prior to the accident Dr. Biggs had been driving his automobile west on the highway at a speed of some sixty to sixty-five miles per hour when he observed a black dog moving straight across the highway from south to north, and, in order to avoid striking the animal, he removed his foot from the accelerator, which had the effect of slowing the speed of his vehicle to some degree. Almost immediately following this incident plaintiff's thirteen-year old daughter, who had *509 been playing with two other children in the driveway of a residence on the south side of the highway, ran diagonally across the road and was struck by the Biggs' automobile at some undetermined point in the north lane of the highway.
Unfortunately, there were no eye witnesses to the actual occurrence except the defendant, Dr. Biggs, and the testimony fails to disclose, with any certainty, some of the salient facts which would substantially assist the court in reaching a conclusion. For example, the exact point of the impact, the definite direction taken by the little girl in attempting to cross the highway cannot be ascertained. The facts established by the evidence must be gleaned from the testimony of Dr. Biggs, Corporal House of the Louisiana State Police, who made an investigation of the accident, and Mrs. Emma Ratcliff. We narrate the material facts derived from the testimony of each of these witnesses as follows:
Dr. Biggs testified that as he was driving west in the center of his right-hand, the north, lane of the highway, at a speed of about sixty miles per hour, he first saw the little girl running across the highway as she was at or near the center line thereof; that he immediately applied his brakes and turned his car to the right, despite which the vehicle struck the child, according to his impression, as she ran into the left front side thereof, and she was thrown up on the hood of the car and struck the rim of its windshield. Dr. Biggs was quite frank in his admission that he did not see the child until she neared or reached the center line of the highway, and his explanation is that his headlights were on low beam, and, because of the diagonal approach of the little girl from the left and somewhat behind the car, the illumination of the lights failed to disclose her presence.
Corporal House testified that there were no physical marks which indicated the point of impact, that the skidmarks of the Biggs Car measured seventy feet on the blacktop surface, after which the right front of the car hit the shoulder of the road and proceeded sideways in the ditch on the north side of the highway for a distance of one hundred forty-six feet before it came to rest. The conclusions of this witness were that there was no violation of speed, which he indicated as being sixty miles per hour; that the braking effect after the car hit the shoulder of the road was lessened, and that it traveled the remainder of the distance at least partially out of control of the driver. Of particular importance with respect to the Trooper's testimony is his statement that "where he (Biggs) left the road is just about I would guess he would have hit her."
The testimony of Mrs. Ratcliff was that she had been watching the little Phares girl playing with her two grandsons, Ronald and David Ratcliff, aged eleven and eight respectively, just before the accident, in the drive immediately at the edge of the shoulder of the highway near her home; that the little girl started running "kinda angling" across the road but that she did not watch; that she could see the Biggs' automobile approaching; knew the child could not safely cross the highway, and later heard the screeching of tires. This witness further testified that the day before the trial she had made a measurement from the point at which she had seen the little girl begin to run to the place of the accident, which she fixed as being fifty-eight feet. Because counsel for plaintiff has stressed this figure in connection with his argument as to elapsed time, distances traveled, stopping distances, etc., we think it important at this point to observe that, in our opinion, the testimony of Mrs. Ratcliff, however well intentioned, is unworthy of acceptance, and in support of this conclusion we quote the following extract of the testimony of this witness on cross examination, as follows:
"Q. Mrs. Ratcliff, are you Mrs. W. E. Ratcliff? A. Yes, sir.
"Q. Mrs. Ratcliff, when did you make these measurements? The ones you were speaking of? A. One yesterday evening and one this morning.

*510 "Q. Was there any point on the highway that you could definitely determine was the place where the accident occurred? A. No, sir.
"Q. You were just guessing? A. Yes, sir, I guess you'd call it guessing just where it seemed to me the best I could tell that's about where it happened.
"Q. That was just an approximation, or a guess, is that right? A. Yes, sir.
"Q. Now, Mrs. Ratcliff, where were you when the accident occurred? A. On this little back porch.
"Q. When you say, `back porch', does your back porch face towards Highway 2, or is it away from Highway 2? A. It's away from itit's I guess you'd call itit's on the east side and the highway's on the north side of the house.
"Q. Your house faces north and the back of it would be to the south, is that right? A. Well, I'd guess you'd call it that. The front of it is to the west because it never was turned around after the highway was put through there.
"Q. The front of your house faces the highway? A. No, sir. It faces the west. The end of the house is towards the highway.
"Q. I see. Yourthe house I see is a long house. A. Yes, sir.
"Q. The endis the end of your house facing the highwaythe side of your house, or is that the front? A. It's the end of that.
"Q. So the front of your house would be facing Lake Providence? A. No, sir. To the west.
"Q. The front of your house would be facing Oak Grove. A. Yes.
"Q. And the back of your house would be facing Lake Providence? A. Yes, sir.
"Q. As you were on the porchon your back porchon your back side of your house? A. Yes, sir.
"Q. In other words you were looking down the highway and you could see Dr. Biggs' automobile approaching, is that correct? A. Yes, sir.
"Q. You could not see him when he struck the child, could you? A. No, sir.
"Q. Because the house obscured your vision from seeing the girl after she passed in front of your vision * * * A. Well, no, sir, I probably could have seen it as far as that * * * but I was looking back at these little boys on the side of the road. I was afraid they was going to try to go across too. I was looking at them. I wasn't looking towards. * * *"
We also deem important the following testimony of the same witness:
"Q. When was the first time that you talked with Mr. William Ragland, the attorney for the plaintiff, relative to the accident? A. Well, I don't remember just when it was. I can't remember just when it was * * * it's been a good while back, but I don't remember just when.
"Q. When you estimated the point on the highway where the little girl was struck, you didn't see the accident yourself, did you? A. No, sir.
"Q. You didn't actually see it? A. No, sir, I didn't.
"Q. When you made an estimate of the point of impact, that was just pure guess, wasn't it? A. Yes, sir, best I could guess at it, that's what he told me to do. Estimate it the best I could.
"Q. There was no blood marks on anyor evidence on the highway when you estimated that point, was there? A. No, sir, not when I estimated it.

*511 "Q. When the little girl left to cross the highway, did she walk or run? A. She was running.
"Q. And you say there were two little boys there? A. Yes, sir.
"Q. They were close to the little girlthey were all three together? A. Yes, sir.
"Q. One more question. Mrs. Ratcliff, you said that you heard brakes squeal on Dr. Biggs' automobile, is that right? A. Yes sir, they made a noise, like you know, they went in on its brakes trying to stop.
"Q. And then did you hear the impact when the car and the girl made a collision or contact? A. I don't remember hearing it.
"Q. You don't remember hearing a thud when they * * * A. No, sir, I guess I just got so unnerved I just don't remember hearing that.
"Q. Were the lights on Dr. Biggs' automobile? A. Yes, sir.
"Q. Were there any other cars in the proximity? A. Yes sir. There was, I don't know, seems like there was two or three behind him.
"Q. Did they have their headlights on? A. Yes, sir, they did.
"Q. It was dusk at the time? A. yes, sir.
"Q. Could you have any difficulty in seeing the little girl? A. Well, it was pretty hard to see `em, but it was light enough I could discover `em after out there, you know.
"Q. It was dark enough for automobiles to have their headlights on? A. Yes, sir.
"Q. But youit wasn't so dark that you couldn't see, is that right? A. No, I couldn't see good, but I could see some."
The only remaining testimony which we deem worthy of comment was developed in connection with a bill of exception reserved by counsel for defendant to a ruling of the district judge as to the admissibility of certain testimony. The testimony excluded by the ruling of the trial judge related to the question as to whether little Dian Phares had made a declaration to her playmates to the effect that she could beat approaching cars across the road. In the testimony, while both Ronald and David Ratcliff denied hearing Dian make such a statement, it is plain that one or both of these little boys repeated such a statement. Donald testified that he did not repeat Dian's alleged statement to his grandmother but "I think my brother did, or somebody." David testified that while he did not hear Dian make such a statement, he thought he had told his grandmother that she had. Mrs. Emma Ratcliff testified that "some child" told her that Dian said she was going to beat the cars across the street. Mrs. Billie Ratcliff, the mother of Ronald and David, testified that one of them told her on the night of the accident that Dian had told them she was going to beat the car (or cars) across the highway.
We think the testimony taken in connection with the bill of exception was pertinent, relevant and should have been admitted, and, for this reason, we have taken notice of the same in connection with our consideration of the facts involved in this case.
On the basis of the above testimony we are convinced that the defendant, Dr. Biggs, was not guilty of any negligence and that the negligence of the decedent was the sole and proximate cause of the accident.
Counsel for plaintiff urgently contends that the doctrine of last clear chance or discovered peril is appropriate under the facts of this case, and upon this doctrine they rely in contending for the affirmance of the judgment in favor of plaintiff. Regretfully, for this is a case that cannot help but appeal *512 to human feelings and emotions, we are unable to agree with this argument.
The doctrine of "discovered peril;" "apparent peril," or "last clear chance" confirmed by the landmark cases of Rottman v. Beverly, et al., 183 La. 947, 165 So. 153, and Jackson v. Cook, 189 La. 860, 181 So. 195, has since been considered in numerous cases before our appellate courts in elaborate detail. Certain essential elements of proof required for the successful invocation of the doctrine must be established by the party relying thereupon. These probative factors were named in Newton v. Pacillo, La.App., 111 So.2d 895, 897 (2nd Circuit, 1959, certiorari denied), as follows:
"(1). That the plaintiff was in a position of peril of which he was unaware, or from which he was unable to extricate himself;
"(2). That the defendant actually discovered or was in a position where he should have discovered plaintiff's peril, and
"(3). That, at the time, the defendant could have, with the exercise of reasonable care, avoided the accident." (Authorities cited.)
Counsel for plaintiff, in arguing the application of the doctrine in the instant case particularly cite and rely upon Belshe v. Gant, 235 La. 17, 102 So.2d 477 (1958); and Broussard v. Thompson (3rd Circuit, 1960), La.App., 128 So.2d 477. The facts in the cited cases are so completely at variance with those developed in the instant case that we cannot regard them as controlling authority. In the Belshe case the accident occurred at a pedestrian crossing located in the intersection of two streets in the City of New Orleans controlled by a semaphore traffic signal, and the conclusion of the court was primarily predicated upon the finding that the defendant motorist was under a duty, before proceeding through the intersection, to exercise due care to discover any pedestrian already in the intersection in reliance on a pre-existing red signal light inhibiting the motorist from entering the intersection, and, further, that the offending motorist was liable, despite plaintiff's contributory negligence, if he could have, by exercise of reasonable care and prudence, discovered the peril of the pedestrian in time to avoid striking her. In the Broussard case the facts involved injuries to a pedestrian while crossing a street in the Town of Eunice in an area which the motorist knew was used by pedestrians and in said case the motorist admitted failure to maintain a lookout.
As we have above pointed out in this opinion, the tragic accident under consideration occurred in a rural area at a place not shown to have been either designated or customarily used for a pedestrian crossing; the defendant motorist was keeping a lookout, and, according to our findings, was exercising due care and caution; the decedent was grossly negligent in attempting to run diagonally across the highway, and, in all reason, must be considered to have been aware of the approach of defendant's automobile and the danger of her action. As was stated by the opinion of Mr. Justice Hawthorne in Franicevich v. Lirette, 241 La. 466, 129 So.2d 740, 742:
"`* * * if there was nothing about the plaintiff's position or physical condition to indicate that he was in danger, it is immaterial whether defendant saw him or not. The paramount inquiry must therefore always bewhether defendant, if he had been maintaining a proper lookout and had seen the plaintiff, would have observed that the latter was in a position of peril' (quoted from Jones v. American Mutual Liability Ins. Co., La.App., 189 So. 169); to which statement we add: in time to act in a way to prevent the accident." (Emphasis by the court in opinion cited.)
In the same case the opinion of the court further declared the principle to *513 be well settled that a plaintiff relying upon the doctrine bears the burden of establishing all the facts essential to make this doctrine applicable, and, further

"* * * these facts must be proved and will not be presumed." (Authorities cited.) (Emphasis supplied.)
As we have observed, the essentials necessary for the application of the doctrine contended for in the instant case have not been proved but rest upon presumptions, speculations and vague conclusions upon the basis of uncertain factual elements.
For the reasons assigned, the judgment appealed from is annulled, set aside and reversed, and
It is now ordered, adjudged and decreed that there be judgment in favor of defendants rejecting the demands of plaintiff at his cost.