153 So.2d 533 (1963)
Cleve T. SMITH
v.
NEW ORLEANS & NORTHEASTERN RAILROAD COMPANY et al.
No. 5841.
Court of Appeal of Louisiana, First Circuit.
May 3, 1963.
Rehearing Denied June 3, 1963.
*534 Brumfield, Turner & Cooper, by H. Alva Brumfield and Sylvia Roberts, Baton Rouge, for appellant.
Monroe & Lemann, by Walter J. Suthon, Jr., New Orleans, Benjamin W. Miller, Bogalusa, Bernard, Micholet & Cassisa, by Peter L. Bernard, Jr., and Paul V. Cassisa, New Orleans, for appellees.
Before ELLIS, LOTTINGER, HERGET, LANDRY and REID, JJ.
LANDRY, Judge.
This present action as well as the matter entitled Elmer L. Wheat v. New Orleans & Northeastern Railroad Company, et al., Number 5842, La.App., 153 So.2d 543 (with which the present suit was consolidated for purposes of trial and appeal) arise from a grade crossing accident involving a 1960 Model Ford Falcon automobile owned by plaintiff, Cleve T. Smith, but being driven at the time by Elmer L. Wheat, plaintiff in Suit Number 5842, and a passenger train operated by defendant railway company. The accident occurred April 18, 1960, at approximately 7:10 P.M., at a crossing in St. Tammany Parish near the intersection of Louisiana Highway 1090 and U.S. Highway 11. Smith sues for the value of his automobile which was completely demolished as a result of the collision. In the companion suit Wheat prays for judgment for personal injuries, loss of earnings and medical expense allegedly sustained and incurred as a result of the accident. From the judgment of the trial court rejecting their respective demands, both plaintiffs have appealed. Defendant railway company has answered the appeals praying that the trial court's dismissal of its reconventional demand against plaintiffs for damages to defendant's locomotive resulting from the collision be reversed and set aside and judgment rendered *535 in favor of defendant in the sum prayed for below.
On the date in question plaintiff Wheat was proceeding westerly along Louisiana Highway 1090, a graveled highway, at a lawful and moderate rate of speed, approaching its intersection with defendant's railway tracks. He stopped before driving onto the tracks, looked in both directions and proceeded to negotiate the crossing. Upon attaining the tracks the engine of the automobile stalled and despite Wheat's efforts he was unable to restart the motor. At the same time a passenger train operated by defendant railway company proceeding southerly over defendant's said tracks at a speed approximating 60 miles per hour, collided with the right side of the stalled vehicle.
By petitions supplemented and amended, both petitioners ultimately named as defendants herein New Orleans and Northern Railroad Company, General Motors Corporation, Casey Harper Ford Company and Ford Motor Company. Defendant railroad company is charged with negligence proximately causing the accident in allegedly having failed to maintain the aforesaid crossing in a safe condition. Plaintiffs also contend defendant railway company, through its employees who were operating the train, was guilty of negligence in failing to maintain a proper lookout, failing to ring the bell, blow the whistle or sound the horn; in operating the train at an excessive rate of speed and failing to exercise the last clear chance of avoiding the accident.
Alleging the automobile stalled due to mechanical failure, namely, a defective fuel pump, plaintiffs maintain defendant, Casey Harper Ford Company, the dealer from whom Smith purchased the vehicle, was negligent in breaching its warranty that the automobile was free of inherent and latent defects, failing to properly inspect and test the vehicle prior to sale to petitioner and failing to warn Smith of the defective fuel pump attached to and forming an integral part of the automobile.
General Motors Corporation, fabricators of the fuel pump used in the manufacture and assembly of the Falcon automobile purchased by plaintiff Smith, was made defendant under allegations charging said concern with negligence in manufacturing, selling and distributing fuel pumps warranted safe and fit for use but actually so defectively and improperly made as to possess hidden vices and defects which caused plaintiff's automobile to stall. Ford Motor Company's negligence is said to consist of its violation of its manufacturer's warranty that the vehicle was free of hidden and latent defects.
During the course of the trial plaintiffs moved to dismiss their respective claims against Ford Motor Company and Casey Harper Ford Company with prejudice but with full reservation of their rights against the remaining defendants.
Defendant railroad company denies all negligence attributed to its employees and reconvened for damages to its engine. Alternatively, said defendant contends that should any of its employees be found guilty of negligence proximately causing the accident, plaintiffs' recovery herein is barred by the contributory negligence of Wheat in failing to maintain a proper lookout, failing to stop at the crossing and look for approaching trains; driving onto the tracks in such an imprudent manner as to permit the vehicle to stop thereon; failing to move the vehicle from its position of danger; driving an automobile with mechanical defects and failing to flag defendant's train.
Answer filed on behalf of defendant General Motors Corporation denied any negligence on its part in the manufacture, inspection or testing of the allegedly defective fuel pump and alternatively contended the accident occurred solely through the negligence of plaintiffs.
Both appellants maintain the trial court erred in (1) finding defendant railroad company free of negligence proximately causing the accident; (2) holding General Motors Corporation was not guilty of negligence in *536 the manufacture, inspection and testing of the fuel pump and (3) failing to render judgment in favor of plaintiffs and award the damages requested in plaintiffs' petitions.
We shall first consider the case against defendant railway company. On the date in question plaintiff Wheat was driving the Falcon automobile with the permission of its owner, Smith, who is Wheat's brotherin law. At approximately 7:10 P.M. Wheat was driving the vehicle westerly along State Highway 1090 and upon approaching the intersection in question stopped, looked in both directions, observed no oncoming trains, and proceeded to cross the railway tracks. He shifted from first to second gear whereupon the motor began to "give trouble" so he shifted back into low gear at which time the automobile "began to jump" and went dead upon the tracks. Wheat's efforts to restart the motor were unsuccessful. While continuing his attempts to start the engine he suddenly noted the approach of defendant's train bearing down upon him from his right or the north. He recalled attempting to "bail out" of the vehicle but remembers no subsequent events until he awoke in a hospital at Picayune, Mississippi, to which institution he was taken immediately following the accident.
It is undisputed it was dark at the time of the accident. It is likewise conceded the highway in question is a graveled roadway 22 feet in width. From a distance of approximately 50 feet on either side of defendant's tracks there is a gradual rise or incline in the highway of approximately two feet. North of defendant's crossing the highway is admittedly straight for a distance of approximately one-half mile. Approximately 75 feet west of and parallel to defendant's right of way is situated U. S. Highway 11.
Defendant's train had last stopped at Poplarville, Mississippi, approximately 20 miles north of the crossing; its next scheduled stop being Slidell, Louisiana, some 2 or 3 miles distant. Although the train was admittedly 8 to 10 minutes behind schedule it was not travelling at an excessive rate of speed as will hereinafter be shown. The record reveals conclusively the crossing in question is situated in what is termed "open country".
J. J. Curren, Engineer in charge of the train, testified he was proceeding at approximately 50-55 miles per hour whereas railway regulations permitted a maximum speed of 80 miles per hour at this particular location. His train was composed of the engine and six cars with an overall length of approximately 415 feet. He was proceeding with his lights on. His lights consisted of a stationary headlight which shone constantly straight ahead and an oscillating "Mars light"; they afforded him a range of vision extending an estimated 1,000 feet. When the train was approximately 1,000 feet distant from the crossing, Curren noted the vehicle upon the tracks and also observed the lights of the automobile were not burning. Thinking the vehicle would proceed over the tracks, he continued his progress. Upon reaching a point approximately 600-700 feet from the crossing, he noted the vehicle was making no effort to clear the tracks and immediately applied his brakes with heavy pressure; he did not apply full or maximum pressure in order to avoid putting the train into an emergency stop. The train struck the stalled automobile and stopped with the rear car approximately 900 feet beyond or south of the crossing.
According to Curren he commenced his regular crossing whistle (consisting of a series or four whistles of 2 and 1-second duration each separated by 1-second pauses lasting a total of 10 to 15 seconds) at a point approximately 900 feet north of the crossing marked by a "whistle board" placed there to warn the engineer of a crossing ahead. At another point in his testimony, however, he stated he did not see the vehicle until after the first whistle.
Jim Barrett, Fireman on the train, was standing near the center of the engine cab *537 looking through the left side of the windshield and observed the car upon the track when the train was approximately 1,000 feet away. He shouted to Curren to blow his warning signal. According to Barrett, when Curren noted the automobile was apparently stationary, Curren released the whistle and applied the brakes whereupon Barrett took hold of the whistle cord and continued to blow. Barrett further testified he saw a person come from behind the driver's side of the car, proceed to the rear and attempt to push the car off the track. When the train reached a point about 20 feet from the disabled automobile, Barrett ducked below the windshield for protection but before doing so observed the person pushing the automobile jump clear to the west. Conceding Barrett's testimony leaves much to be desired from the standpoint of credibility, the matters concerning which he testified are not determinative of the issues presented as will hereinafter appear.
On the trial of these consolidated cases plaintiffs made no serious effort to establish defendant's alleged negligence in failing to maintain the crossing in a safe condition.
Plaintiff's allegations to the effect the train was being operated at an excessive speed are clearly without foundation in the record. The maximum speed testified to by any witness was the estimate of B. L. Sutherland, conductor, who stated the train was proceeding at approximately 60 miles per hour. Both Curren and Barrett fixed the approximate speed of the train at 50-55 miles per hour before the brakes were applied. The speed at the moment of impact was estimated by Curren at between 40 and 45 miles per hour.
The record reveals the crossing in question to be situated in a rural area. Clearly, therefore, the "open country doctrine," repeatedly recognized and reaffirmed by the appellate courts of this state, is applicable to the cases at bar. It is settled jurisprudence in this state that in open country and sparsely settled rural areas there is no legal restriction upon the speed of railway trains and in such areas trains may be operated at any speed consistent with the safety of the train, its passengers and crew. Houston v. Vicksburg, S. & P. R. Co., 39 La.Ann. 796, 2 So. 562; New Orleans & Northeastern Railroad Company v. Scogins, La.App., 148 So.2d 909. The "open country doctrine" further sanctions the proposition that in sparsely settled rural areas trains are not required to be operated at such speeds they may be stopped within the range of vision of the engine crew. See New Orleans & Northeastern Railroad Company v. Scogins, supra, and cases therein cited.
Despite applicability of the foregoing rules, appellants nevertheless contend defendant railroad company is liable on the ground its employees failed to exercise the last clear chance to avoid the accident.
As has been stated on innumerable prior occasions, application of the doctrine of last clear chance is dependent upon the establishment of three essential factors, namely: (1) plaintiff must have placed himself in a position of peril of which he was unaware or from which he was unable to extricate himself; (2) defendant must have been in position such that he actually discovered plaintiff's peril or, by the exercise of ordinary and reasonable care should have discovered plaintiff's danger; and (3) at the time defendant either discovered or should have discovered plaintiff's peril, defendant could have avoided the accident by the exercise of ordinary and reasonable care. Sonnier v. Great American Insurance Co., La.App., 134 So.2d 363; Phares v. Biggs, La.App., 135 So.2d 507; Palmisano v. Ryan, La.App., 136 So.2d 173; Brown v. Louisville & N. R. Co., D.C., 135 F.Supp. 28 (affirmed 5 Cir., 234 F.2d 204).
Plaintiffs herein clearly establishes the first two elements incident to their respective pleas of last clear chance. Unquestionably the automobile was stalled on the track in a position of danger and it is conceded that both the engineer and fireman observed *538 the vehicle upon the tracks. The third essential element, however, namely, opportunity to avoid the accident by exercise of ordinary and reasonable care, is lacking herein. The record is undisputed to the effect the engineer's visibility was approximately 1,000 feet. At approximately that distance from the crossing the engineer did in fact note the presence of the vehicle upon the track without lights. His noting the presence of the vehicle immediately when it came within the range of his vision is proof positive of his vigilance. Upon observing the vehicle at first glance, he had every reason to assume it would clear the track. When it became evident the vehicle would not complete the crossing, Curren did everything he could to avoid the impending accident. He applied his brakes but despite this maneuver the train proceeded through the crossing striking the automobile.
The record in the instant case is barren of evidence regarding stopping distances under the circumstances obtaining herein. It does not appear that the train could have been stopped in time to avoid the accident assuming the engineer had applied the brakes upon first noting the automobile upon the track. Learned counsel for appellants makes much of the fact Curren admittedly did not apply the brakes full force or attempt an emergency stop. This avails plaintiffs nothing considering there is not one scintilla of evidence in the record regarding stopping distances. The record is devoid of evidence to the effect the train could have been brought to a normal stop when Curren first observed the car on the tracks while still approximately 1,000 feet distant. The record is similarly barren of testimony establishing that the train could have been stopped in time to avoid the accident had Curren applied the brakes full force or attempted an emergency stop while still 600-700 feet distant from the crossing. It was incumbent upon plaintiffs to establish this essential factor in order to recover under the doctrine of last clear chance considering it is plaintiff's obligation to prove, by a preponderance of evidence, every material element necessary to his cause of action.
Esteemed counsel for appellants relies heavily upon Begnaud v. Texas & New Orleans Railroad Company, La.App., 136 So.2d 123, in urging our application of the doctrine of last clear chance in the instant case. Our careful consideration of the Begnaud case, however, reveals the cited authority to be so factually dissimilar to the case at bar as to be totally without application herein. In the cited case the train was proceeding at a speed of 67 miles per hour and was involved in an accident which occurred in daylight at approximately 2:30 P.M. The evidence adduced therein established a stopping distance of 1200 to 1500 feet and further showed the train proceeded a distance of 1629 feet beyond the crossing indicating no application of brakes prior to the collision. Moreover, it was therein established the train crew had an unobstructed view of the crossing for a distance of 1500 to 1600 feet. Under the circumstances shown, the appellate court refused to disturb a jury verdict in favor of plaintiff.
In the case at bar, however, the accident occurred at night when the train crew's range of vision was 1000 feet. The record in the instant case fails to establish the essential element of opportunity to avoid the accident.
It follows that the judgment of the trial court rejecting and dismissing plaintiffs' demands against defendant New Orleans & Northeastern Railroad Company is correct and must be affirmed.
Plaintiffs' demands against defendant, General Motors Corporation, is predicated upon the well recognized principle that a manufacturer is under a duty to make an article carefully where the nature of the article is such that it is reasonably certain to place life and limb in peril when negligently made and incurs liability to third persons injured as a result of his failure to *539 perform this duty. C.J.S. Volume 65, Negligence § 100 page 629, states the rule thusly:
"As a general rule a manufacturer is under a duty to make an article carefully where its nature is such that it is reasonably certain to place life and limb in peril when negligently made, and he is liable to a third person for an injury resulting from a failure to perform this duty.
"The duty of the maker or vendor of an article harmless in kind, but dangerous through defect, has been said to be in general a negative duty, that is, not knowingly so to dispose of the article that it may become a trap to the innocent; and it has also been said that the manufacturer of such an article is under no general or public duty to exercise care in its manufacture for the safety of persons with whom he has no privity of contract. As a general rule, however, the manufacturer is under a duty to make the article carefully where its nature is such that it is reasonably certain to place life and limb in peril when negligently made, if put to the use for which it is designed and intended or to a use which can reasonably be anticipated, and there is knowledge that the article will be used, without new tests, by persons other than the purchaser; and he is liable for an injury to a third person resulting from a failure to perform this duty, if such injuries could reasonably be anticipated, although there is no contract or privity between the parties. The fact that the article is not inherently dangerous if properly made is immaterial. The failure of the purchaser to make tests of the article does not absolve the manufacturer from liability to third persons."
The record reveals plaintiff Smith purchased the Falcon automobile from Casey Harper Ford Company in December, 1959. At the time of the accident the vehicle had been driven approximately 12,300 miles. The gravamen of the complaint against defendant, General Motors Corporation, is, in substance, to the effect said defendant negligently manufactured the fuel pump on the Ford Falcon automobile and sold same to the Ford Motor Company in a defective condition. In essence, plaintiffs charge said defendant not only with negligence in the defective manufacture and assembly of the fuel pump but also negligence in failing to properly test said device prior to selling same to the Ford Motor Company for incorporation into a motor vehicle. Plaintiffs contend the accident occurred because the defective fuel pump manufactured by defendant, General Motors Corporation, either malfunctioned or failed to function causing the vehicle to stall upon the railroad tracks thereby rendering said defendant liable herein.
In attempting to show the fuel pump was defective from the time plaintiff purchased the vehicle, plaintiff introduced evidence to the effect he had taken the vehicle back to the dealer, Casey Harper Ford Company, (from whom plaintiff Smith purchased the car new), on at least three occasions prior to the accident and complained of the car's stalling upon shifting the gears at low speeds. The record shows, however, that on two of these occasions the vehicle was returned for regular 1000 and 3000 mile checks. Records of Casey Harper Ford Company indicate the clutch was adjusted and certain other minor adjustments made at the 1000 mile check. When brought in for the 3000 mile check the vehicle was greased, the oil was changed, the carburetor was checked and repairs were made to the cigarette lighter. According to employees of Casey Harper Ford Company, had plaintiff made any complaint regarding the vehicle mention thereof would appear on the company's records and no such notations appear thereon.
Plaintiffs' demands against said manufacturer are predicated entirely upon the testimony of Mr. Alvin Doyle, Jr., an automotive consultant possessing considerable experience in automobile accident investigation and the reconstruction.
*540 Doyle testified he examined the vehicle at Casey Harper Ford Company in Slidell, Louisiana, on May 13, 1960. He found the vehicle had been struck on its right side approximately 74 inches back from the front bumper to a point 46 inches in front of the rear bumper. The right side of the vehicle was forced over to the left approximately 24 inches resulting in the right wheel base being shortened 10 inches as compared with the left. The front seat was shoved out of the left door approximately 14 inches. To ascertain the cause of the vehicle's stalling upon the track, Doyle had certain components of the car removed for his inspection. Upon removal the transmission disclosed no defects save those attributable to the force of the impact. Inspection of the clutch revealed some slippage but no defect of such magnitude as to affect the safe and proper operation of the vehicle. The carburetor contained fuel in such amount as would be expected to be present had the vehicle run out of gas. The fuel tank was understandably empty considering the impact caused several holes and tears thereto and the drain plug was pushed into the tank leaving a ¾ inch opening in its lower right edge. It appeared the right rear spring had damaged the gas tank as a result of the impact.
Doyle removed the carburetor and fuel pump to his laboratory where both were tested. Predicated upon his examination he concluded the fuel pump was not operational. After completing his tests, Doyle disassembled the pump and found that a gasket (also referred to as a pulsator diaphragm) forming an essential part thereof had been cut resulting in a vacuum leak which prevented the pump from functioning and rendered it incapable of delivering fuel to the carburetor. Based on this discovery, he concluded the motor stalled due to malfunctioning of the fuel pump which shut off fuel to the engine.
In order that Doyle's theory regarding the alleged malfunctioning of the fuel pump may be fully understood, explanation, in some detail, of the construction of said device is necessary.
For purposes of the present discussion the record reveals an automobile fuel pump is in reality a vacuum operated device mounted and located on the left or driver's side of the engine. Power for its operation is derived from an "eccentric" attached to the engine crankshaft. The completely assembled pump consists of upper and lower chambers or units contained in separate castings or housings joined together as hereinafter noted. Both the upper and lower chambers contain diaphragms serving entirely different purposes as hereinafter indicated. The lower component of the pump consists of a metal casting or housing constituting a chamber to the bottom or lower portion of which is attached a glass container known as a "sediment bowl". The upper portion of the pump contains a solid or unperforated diaphragm and two chambers, one known as the vacuum or inlet chamber and the other as the pressure or outlet chamber. The pump is so constructed that gas from the fuel tank enters the lower portion of the pump, flows through the sediment bowl and then upward into the intake chamber of the upper part of the device from where it then enters the pressure or outlet chamber from whence it proceeds to the carburetor. Through a system of levers and linkages the eccentric, attached to the engine crankshaft, revolves causing a "rocker arm" thereto attached to move alternately upward and downward. The rocker arm, in turn, is attached to the diaphragm in the upper portion of the pump. As the rocker arm alternately moves up and down it causes the diaphragm to impinge upon a calibrated spring whose function is to control certain valves whose purpose is hereinafter shown.
Since a vacuum is required inside the assembled pump to assure its proper operation, the upper and lower components are joined and held together by a bolt which passes through both units. The seam formed by the joining of the housings of the *541 upper and lower parts of the pump is sealed airtight by means of a device known as a "pulsator diaphragm" which is in reality, a round disc of synthetic rubber. The pulsator diaphragm serves a dual purpose in that it acts as a gasket to insure an airtight seal between the housings of the upper and lower components thereby maintaining the vacuum required for the pump's internal operation while at the same time insuring a smooth and even flow of fuel from the lower unit to the upper units at speeds exceeding 60 miles per hour. The solid outer edge or rim of the pulsator diaphragm extends to the exterior surfacing of the housing of the upper and lower units and constitutes the gasket portion thereof effecting the seal. The inner and center portion of the pulsator diaphragm is equipped with a central hole through which passes the bolt holding the upper and lower components together. Arrayed in a circle, surrounding the central or bolt hole, are six small round holes whose purpose is to smooth the flow of fuel from the lower chamber into the upper intake chamber at high speeds. Basically, the assembled mechanism works as follows: On the upstroke of the rocker arm the solid or unperforated diaphragm in the upper section reduces pressure in the lower portion of the pump causing gas to flow from the fuel tank into the lower or bowl section of the pump. Upon entering the lower chamber, the fuel passes into the sediment bowl from which point it is drawn into the upper intake chamber (through the circle of holes in the pulsator diaphragm) by means of an intake check value operated by the calibrated spring actuated by the diaphragm attached to the rocker arm as previously explained. On the downward stroke of the rocker arm the upper inlet valve closes and a similar check value known as an outlet value operating in the opposite direction is forced open permitting the fuel to pass into the outer or "pressure chamber" from whence it flows into the carburetor.
Upon examining the components of the disassembled fuel pump, Doyle found a cut approximately one inch in length near and paralleling the outer rim or edge of the pulsator diaphragm at the point where the outer surfaces of the upper and lower housing units of the pump join together and form the seam which the pulsating diaphragm is supposed to seal. In Doyle's opinion the cut near the edge of the pulsating diaphragm resulted in a leak which admitted atmospheric pressure into the pump destroying the vacuum required for its proper functioning and rendering the pump inoperational. Doyle was of the further opinion the cut in the pulsating diaphragm occurred gradually because of defective manufacture of the housing units containing the upper and lower components of the pump. In this regard he testified his examination showed the housing units were not smooth and even so that when bolted and joined together they did not bear evenly and exert uniform pressure on the entire outer rim or edge of the pulsating diaphragm and as a result thereof the hole or split occurred at the point of greatest pressure and became progressively larger.
Gordon Elder, Staff Engineer for the A. C. Spark Plug Division of General Motors Corporation, testifying on behalf of defendants, stated the fuel pump in question was designed under his personal supervision. He explained in detail the complete operation of the device and was of the opinion the cut shown in the pulsator diaphragm would not affect the operation of the pump at speeds of less than 60 miles per hour. At speeds in excess of 60, however, the pulsating diaphragm would be affected in that it would not perform one of its functions, namely, that of smoothing and evening the flow of fuel at high speeds. He further stated that at speeds under 60 miles per hour the sole function of the pulsating diaphragm was to serve as a sealing gasket. Concerning the effect of a leak in the sealing gasket he stated a leak would not result in total engine failure unless the sealing gasket were completely out. In the event of a partial seal failure the pump would malfunction preventing the engine *542 from attaining maximum speed, but it would still operate and run.
Defendants also called as a witness Mr. Richard M. Shield, automotive engineer, Ford Motor Company, who testified the metal castings constituting the housing of the components were die cast and consequently their respective surfaces were not perfectly true, even and smooth, therefore, the presence of a gasket between the two was required to provide a true and effective seal. Shield, who is shown to possess considerable knowledge, skill and training in the manufacture of component automobile parts, was also of the opinion the fuel pump in question would operate despite the cut pulsator diaphragm.
William Pfander, a metallurgist, Supervisor of Product Analysis Section of the Chemical and Metallurgical Department of the Quality Control Office of Ford Motor Company, testifying on behalf of defendants stated that certain flattened areas appearing on the outer surfaces of the components were caused by "forceful contact with an object which was sufficiently hard to mar the casting and sufficiently strong to deform the casting." He attributed this flattening and unevenness of the parts to the force of the impact resulting from the collision. Pfander's examination of the pump revealed the application of a sudden force of such intensity as to mark the exterior surface, flatten the metal and force the lower casting against the screw threads of the connecting or joining bolt with such force that the hole in the center of the lower casting showed impressions of a screw from the bolt. He also expressed the opinion the force of the impact generated a lateral shifting opening up the side of the seam from which the force of the blow was being applied thus pinching the side of the union diametrically opposite and causing the gasket to be cut at the point where the pinching action occurred. He attributed this pinching action as the cause of the cut in the pulsating diaphragm and further opined the smoothness and evenness of the cut indicated it was produced by a sudden application of force rather than occurring gradually and progressively as contended by Doyle. According to Pfander, if the cut in the diaphragm occurred gradually because of the uneven surfaces of the components as stated by Doyle, instead of being smooth and even as indicated by the diaphragm introduced in evidence, it would have been rough and jagged. In addition, Pfander found the center hole of the pulsator diaphragm (through which the bolt passes) was cut and distorted on the side opposite the blow confirming his theory the cut in the diaphragm was caused by pinching resulting from the force of the collision.
Any leakage which Doyle's examination and experiments may have revealed is attributed by defendants' experts to a battery or electrical fire which followed the accident. Although witnesses testified the fire was inconsequential and quickly extinguished, Pfander testified his examination of the vehicle revealed a fire occurred in the general area of the fuel pump and attained such intensity the copper wires reached the melting point and beaded. To Pfander this circumstance indicated wires adjacent to the fuel pump had been subjected to temperature of at least 1900 degrees. Also, according to Pfander, the fire accounted for the fact the outer edge of the pulsating diaphragm next to the cut was charred, hardened and honeycombed. It also explained, in Pfander's opinion, the absence of 5/8 inch tabs which should have protruded from the edges of the pulsating diaphragm but were missing and appeared to have been burned away.
No citation of authority is required in support of the principle that plaintiff in a tort action bears the burden of establishing his case by a fair preponderance of evidence. From the foregoing analysis of the pertinent testimony, it appears there is irreconcilable conflict between the experts testifying on behalf of the parties. Our careful consideration of the evidence of record herein convinces us the *543 testimony given by defendants' experts preponderates in both quantity and quality over that offered by appellants. The knowledge, skill and experience of defendants' expert witnesses far outweighs that of plaintiffs' sole witness, Doyle. Moreover, the explanations given by defendants' said experts appear well founded and based on sound reasoning. It follows that appellants have failed to bear the burden of proof incumbent upon them and, accordingly, the learned trial court did not err in rejecting appellants' demands against defendant, General Motors Corporation.
The final question remaining is whether the lower court erred in rejecting the reconventional demand of defendant railway company against plaintiffs for damages to its locomotive.
In brief, plaintiff in reconvention virtually concedes it failed to prove any negligence whatsoever on the part of the driver, Elmer L. Wheat, proximately contributing to the accident. Plaintiff in reconvention urges, however, the record indicates defendant in reconvention, Cleve T. Smith, was negligent in failing to warn Wheat the loaned vehicle had a tendency to stall or go dead when gears were shifted at slow speed. In so contending, plaintiff in reconvention relies upon Sears v. Interurban Transp. Co., 14 La.App. 343, 125 So. 748, holding an owner liable for the results of an accident resulting from his failure to warn a bailee of a defect in a loaned or borrowed automobile, the defect in the cited case being in the steering mechanism. The present owner, Smith, concedes he did not apprise Wheat of the car's tendency to stall.
Assuming arguendo, the vehicle in question tended to stall as contended by Smith, we find no basis for imposing liability upon its owner for failure to disclose such fact to Wheat. The record discloses Wheat had never previously driven or ridden in the vehicle in question. It further appears, however, Wheat borrowed the vehicle approximately one hour prior to the accident and while driving it prior to the collision noted he had to race the motor or "rev it up" to keep the engine from stopping when he changed gears or stopped. He also testified he crossed the tracks in question approximately four or five times in the vehicle during the interval between his borrowing the automobile and the occurrence of the accident. It is apparent, therefore, Wheat was aware of the condition of the vehicle and Smith's failure to apprise him of the vehicle's idiosyncracies in no way contributed to the accident.
For the reasons hereinabove set forth, the judgment of the trial court is affirmed.
Affirmed.