GARRISON, Judge.
This is an appeal from a judgment of the district court, dismissing the action of Dolores Faciane DeBattista, wife of/and Joseph DeBattista for injuries sustained by Mrs. DeBattista, when she was administered allegedly unwholesome blood, while under treatment at Southern Baptist Hospital. Subsequent to the administration of the transfusion, Mrs. DeBattista contracted Type B Serum hepatitis. The defendants are Southern Baptist Hospital, Inc., d/b/a Southern Baptist Hospital, Southern Hospital Blood Bank, Dr. Ralph M. Hartwell, Dr. George A. Hauser, Argonaut-Southwest Insurance Co. and St. Paul Fire & Marine Insurance Co. After a hearing on the merits, the trial court dismissed plaintiffs’ case stating:
“ . . this Court does not find that there is any implied warranty in connection with the sale of blood. Said warranty this Court believes is protected by specific statute. This Court further believes that no evidence was adduced that convinces it there was negligence in the preparation of the blood, the infusion of the blood or the storage of the blood.”
From that judgment which we now affirm, Mr. and Mrs. DeBattista appeal.
On appeal, the plaintiffs-appellants raise the following issues alleging that the trial judge committed manifest error in failing to find:
1. That the blood bank owed a duty to inform those recipients of the blood processed and/or sold by it of the potential harms inherent therein in order to obtain fully informed consent from those recipients, and that Southern Baptist Blood Bank [1], hereinafter Blood Bank, failed to so inform Mrs. DeBattista.
2. That the blood bank which processed those units administered to Mrs. DeBattis-ta, failed to obtain her informed consent prior to the administration.
3. That Southern Baptist Hospital failed to obtain Mrs. DeBattista’s informed consent prior to the administration of the unwholesome units of blood.
4. That Mrs. DeBattista’s treating physician failed to obtain from her requisite fully informed consent to the transfusion procedure.
5. That the requirement of informed consent includes full disclosure of reasonably foreseeable harms of which serum hepatitis is one.
6. That he who creates the risk is responsible for the harm incurred thereby under Loescher v. Parr, 324 So.2d 441 (La., 1975) and C.C. Art. 2317.
7. That the blood bank owed a duty to Mrs. DeBattista to inform her that the *520 blood administered was unwholesome and defective once that knowledge was manifest to the blood bank.
8. That the blood bank owed a duty to disclose the unwholesome transfusion to Mrs. DeBattista in order to aid in the mitigation of her damages.
9. That once it was known that the blood was in fact defective, Mrs. DeBattis-ta’s treating physician owed a duty to inform her of the defective nature of the blood administered.
10. That the patient’s right to self-determination shapes the boundaries of the hospital’s duty to disclose potential harms and alternative treatments and the harms inherent therein.
11. That the choice of treatment lies with the patient.
12. That implicit in the duty to inform the patient of all potential harms inherent in the transfusion procedure lies the duty to inform the patient that the blood drawn from a voluntary donor is statistically safer than blood drawn from a paid donor.
13. That Louisiana Civil Code Article 1764(B)(1), which abnegates an implied warranty of fitness and/or merchantability for the sale of human blood, blood plasma, or other human tissue or organs from a blood bank or reservoir of other tissues or organs, is unconstitutional, as a denial of due process, as overbroad in failing to operate equally and fairly to those engaged in like transactions, and vague, as a violation of public policy, and as a prohibited grant of special immunity under Article 3 § 12(7) of the Louisiana Constitution of 1974.
14. That the exclusion of blood as a product is inconsistent with public policy, societal needs, and the present state of the medical arts.
15. That blood is an inherently dangerous product which gives rise to the imposition of strict liability in tort.
16. That the blood bank failed to follow acceptable medical standards in screening donors and testing blood.
17.That Southern Baptist Hospital failed to follow acceptable medical standards in administering blood transfusions.
On appeal, defendants-appellees, Southern Baptist Hospital on its own behalf and on behalf of the Southern Baptist Blood Bank and their insurer, Argonaut-Southwest Insurance Co., argue:
1. That a blood bank is under no obligation to obtain informed consent from the recipient of the blood.
2. That the duty to obtain informed consent lies solely in the treating physician.
3. That neither the Hospital nor the Blood Bank were under any obligation to notify Mrs. DeBattista or her treating physician once it was determined that the blood administered was in fact unwholesome.
4. That neither the Hospital nor the Blood Bank were negligent in screening donors, testing or administering the blood.
5. That blood is not a product but a service, hence the sale of blood is not subject to the imposition of strict liability.
6. That blood is not subject to implied warranties of fitness and merchantability under express legislation contained in C.C. Art. 1764(B)(1).
7. That the potential risk of harm from contraction of hepatitis due to transfusions is outweighed by the benefits of blood transfusions, so that public policy dictates that in the absence of foolproof methods of testing for serum hepatitis, suppliers and prescribers of blood products should not be held liable.
8. That blood is not an inherently dangerous substance.
9. That C.C. Art. 1764(B)(1) is constitutional and does not create a prohibited special immunity.
The operative facts in the instant appeal are as follows:
On January 26, 1973, Robert Watson sold blood for $20.00 per unit to Southern Baptist Blood Bank. Robert Watson had a history of mental disease. He received a psychiatric rejection from the Army as he was classified 1-Y and diagnosed a schizo *521 phrenic. Additionally, he had contracted syphillis in 1971 for which he had been treated by the New Orleans Venereal Disease Clinic and which had been reported to the appropriate health authorities. Pursuant to the sale of blood made to Baptist, Robert Watson was interviewed by blood bank personnel. He also responded to a screening questionnaire. When asked if he had a history of syphillis, the questionnaire indicates that he responded in the negative. The questionnaire did not specifically ask if the potential donor had a history of mental disease. Robert Watson was accepted as a commercial donor for one unit of whole blood. This unit, Number S-0783, was tested on January 29, 1973. The results for hepatitis were negative. On February 14, 1973, unit Number S-0783 was administered to Mrs. DeBattista as part of her post-operative care in conjunction with a hysterectomy performed at Southern Baptist Hospital by Dr. Jefferson Steele. Mrs. DeBattista was discharged from Baptist.
Exactly 60 days later, on March 26, 1973, Robert Watson again attempted to sell whole blood to the blood bank. This second unit of blood returned positive results for the Type B Serum hepatitis test. On March 29, 1973, the blood bank notified Mr. Watson of the positive test results and suggested that he authorize his physician to obtain the test results. Accordingly, Watson’s test results were forwarded to his physician, Dr. Edward S. Hyman.
In the interim, Mrs. DeBattista began to experience severe symptoms of hepatitis. On April 16,1973, Dr. Steele diagnosed Mrs. DeBattista’s symptoms to be Type B Serum hepatitis,. She was readmitted to Baptist on April 18, 1973 where she remained an inpatient until May 2, 1973. In August of 1974, she began treatment as an outpatient at Oschner Clinic for Type B Chronic Serum hepatitis. Mrs. DeBattista is still an outpatient at Oschner Clinic.
While unit Number S-0783 is a suspected source of the hepatitis contracted by Mrs. DeBattista, she was also in contact with another potential source. Mrs. DeBattista’s sister, Joyce Faciane had contracted the same type of hepatitis at Southern Baptist Hospital[2] one year prior to the date on which Mrs. DeBattista entered Baptist. Joyce Faciane was asymptomatic. Mrs. De-Battista testified that she visited her sister regularly throughout this period.
While Mrs. DeBattista’s history chart dated February 14, 1973 does not indicate hepatitis under the section on “Review of Systems,” the peculiar nature of Type B Chronic Serum hepatitis is such that she could have already contracted the disease but it would not have appeared on the HAA-CEP [3] test then in use. Chronic Type B Serum hepatitis has an incubation period of 50-180 days.[4] Thus, unit Number S-0783 which returned negative results could have been wholesome at the time administered, if Robert Watson had contracted hepatitis within the 60 day period to the second testing. Mrs. DeBattista may have contracted hepatitis from her sister either prior to the surgery or after. The HAA-CEP test has only a 30% effective rate when used to test the blood of asymptomatic carriers.[5] Thus, it is apparent to this court that the plaintiff failed to establish by a preponderance of the evidence that unit Number S-0783 was unwholesome at the time of the transfusion and that it was the source of Mrs. DeBattis-ta’s injury.
*522 While this court may not necessarily agree with the written reasons of judgment rendered by the district court, we find that the judgment is not manifestly erroneous in its results. Hence, for the reasons discussed above, the judgment of the district court is affirmed.

AFFIRMED.

STOULIG, J., concurs in the result.

. New Orleans Blood Bank, Inc., hereinafter “N.O.B.B.”, a processor and wholesaler of biological products, which provided some blood to Southern Baptist Hospital, was originally joined as a co-defendant. N.O.B.B. was later dismissed when it was discovered that the unit at issue was drawn and processed by the Southern Baptist Hospital Blood Bank.

. Joyce Faciane is party to the suit, Joyce Faciane, wife of/and John Martin v. Southern Baptist Hospital et al., CDC # 555-334.

. “HAA-CEP” — Hepatitis Associated Antigen — Counterelectrophoresis (T. p. 83.)

. Attorney’s Textbook of Medicine, by Roscoe N. Gray, M.D., Vol. 2, ¶ 38.34, Matthew Bender Publishing Co. (3rd Ed., 1977).

.This court’s research has revealed that there currently is the “HIM” test which offers the definite possibility of being the solution to the problem of the detection of viral hepatitis carriers among blood donors.” Weaver, King & Brown, A Clinical Evaluation of the “HIM” Test, 49 American J. of Criminal Pathology 647, 651 (1968). Serum Hepatitis Through Blood Transfusions: A Wrong Without a Remedy? 24 Southwestern L.J. 305, 307 (1970). Hence, the outcome may be different under a proper case.