818 So.2d 833 (2002)
Joan Chauvin, and her Husband, B.J. CHAUVIN, Jr.
v.
SISTERS OF MERCY HEALTH SYSTEM, ST. LOUIS, INC., d/b/a Mercy Hospital and Christian Health Ministries formerly know as Mercy Hospital.
No. 2001-CA-1834.
Court of Appeal of Louisiana, Fourth Circuit.
May 8, 2002.
*834 C.A. Fleming, III, Fleming & Rosamond, L.L.P., Metairie, LA, for Plaintiff/Appellant.
Eve B. Masinter, Monica A. Frois, Margaret Diamond, McGlinchey Stafford, PLLC, New Orleans, LA, for Defendant/Appellee.
(Court composed of Chief Judge WILLIAM H. BYRNES III, Judge STEVEN R. PLOTKIN, Judge JAMES F. McKAY III).
BYRNES, Chief Judge.
Plaintiffs, Joan Chauvin and her husband, B.J. Chauvin, Jr., individually and on behalf of their minor daughter, Angela Chauvin, appeal the February 13, 2001, summary judgment dismissal of their strict liability and loss of consortium claims; and the May 18, 2001 judgment granting Defendants' Motion to Dismiss Plaintiffs' Negligence Claims and the Remaining Derivative Claims for Failure to Supplement and Incorporated Memorandum.
On August 26, 1963, the plaintiff, Mrs. Chauvin was admitted to Mercy Hospital. She gave birth to a child by caesarean section on August 28, 1963. Mrs. Chauvin received blood transfusions at the hospital on or about August 28, 1963, and August 31, 1963, for which she was billed $70.00 per transfusion.
In 1996, Mrs. Chauvin was diagnosed with Hepatitis C and has been diagnosed with cirrhosis of the liver and episodes of ascites, an abnormal oozing of fluid from the liver into the abdominal cavity caused by the cirrhosis. Plaintiff alleges that she requires a liver transplant. She further alleges that she acquired the Hepatitis C from the blood transfusions she received in August of 1963 at the defendant, Mercy Hospital.
Mrs. Chauvin filed suit on September 11, 1996, naming as defendants, Sisters of Mercy Health System, St. Louis, Inc., d/b/a Mercy Hospital and Christian Health Ministries formerly known as Mercy Hospital. Defendants may hereinafter be referred to from time to time collectively as "Mercy Hospital." Mr. Chauvin joined in the original petition alleging mental anguish and loss of consortium arising out of his wife's condition.
On September 23, 1996, plaintiffs filed a First Supplemental and Amending Petition for Damages, adding as an additional plaintiff, their minor daughter, Angela Chauvin who, like her father, claimed damages for emotional distress and loss of consortium.
While Mercy Hospital hotly contests the issue of causation, for purposes of argument only, this court will assume that the plaintiffs have successfully carried their burden of proving that Mrs. Chauvin acquired Hepatitis C from the 1963 transfusions she received from Mercy.

I. THERE IS NO ERROR IN THE REFUSAL OF THE TRIAL COURT TO RECUSE
In their first assignment of error, plaintiffs complain that it was error *835 for the trial judge not to have recused herself, thereby avoiding the appearance of impropriety caused by the fact that she was a former associate of the defense counsel's law firm. Mercy contends that the trial judge has not been associated with defense counsel's firm for several years. The plaintiffs do not suggest otherwise. The basis for plaintiffs' motion to recuse is not among the statutory grounds for recusal under LSA-C.C.P. art. 151. The list of grounds for recusal is exclusive, not illustrative, and there must be a statutory ground for recusing a judge. Pierce v. Charity Hosp., 550 So.2d 211, 215 (La. App. 4 Cir.1989). A mere appearance of impropriety, not statutorily listed in LSA-C.C.P. art. 151, cannot be a basis for recusal. Id. Plaintiffs' attempt to recuse the trial judge raised for the first time in connection with this appeal comes too late. Campbell v. National Union Fire Ins. Co., 92-592 (La.App. 3 Cir. 12/7/94), 647 So.2d 569. Plaintiffs offer no excuse for failing to bring a motion to recuse in the trial court. Plaintiffs acknowledge in their brief that the trial judge admitted at the outset that she was a former associate of the defense counsel's law firm. We find no merit in plaintiffs' first assignment of error.
Having assumed for purposes of argument that the plaintiffs have established causation as a matter of fact, the balance of the case can be boiled down to the answer to the following two questions of law: (1) Did a cause of action exist for damages arising out of a blood transfusion contaminated with Hepatitis C in 1963 based on the facts of this case? and/or (2) Is Mercy entitled to the "unavoidably unsafe" defense found in the Restatement of Law of Torts (Second) Section 402(a), comment k, or its equivalent. If the answer to either or both of these legal questions is "yes," then we must affirm the decision of the trial court.

II. THE PRESENCE OF HEPATITIS C IN MRS. CHAUVIN'S TRANSFUSIONS WAS AN UNAVOIDABLY UNSAFE CONDITION
"... As comment k to Section 402A instructs, an unavoidably unsafe product is neither defective nor unreasonably dangerous if such a product is `properly prepared, and is accompanied by proper directions and warning'.
Kinney v. Hutchinson, 468 So.2d 714, 718 (La.App. 5 Cir.1985).
Hepatitis C was unknown in 1975. Turnage v. Columbia Lakeside Hospital, 98-1263 (La.App. 5 Cir. 3/30/99), 731 So.2d 919, 922. Per force, it was unknown in 1963. Prior to the time that it was specifically identified as Hepatitis C, it was lumped in the category of non-A non-B Hepatitis. Even this category was unknown in 1963. As its existence was unknown, no test existed in 1963 to detect it. In 1963 no steps would have been taken to prevent what was not known to exist. Regardless, the plaintiffs insist that they are entitled to recover under a theory of strict liability.
Strict liability for blood transfusion was first enunciated in DeBattista v. Argonaut-Southwest Insurance Co., 403 So.2d 26 (La.1981). The landmark nature of the DeBattista decision was recently described by the Supreme Court in its most recent pronouncement in this area of the law found in Williams v. Jackson Parish Hospital, 00-3170 (La.10/16/01), 798 So.2d 921[1]:

*836 Williams' strict liability cause of action against JPH is premised on the seminal case of DeBattista v. Argonaut-Southwest Insurance Co., 403 So.2d 26 (La. 1981), which first recognized such claims. For ease of reference, we refer to her cause of action as a DeBattista claim.
In DeBattista, supra, we recognized health care providers' exposure to strict products liability claims arising out of defective blood transfusions, reasoning that "[a] distributor of blood is strictly liable in tort when blood he places on the market creates an unreasonable risk of harm to others and, in fact, results in injury or disease to a human being." 403 So.2d at 32. With that decision, Louisiana became one of the handful of states that imposed strict liability on hospitals (as opposed to blood banks) for defective blood transfusions.[2] In Shortess v. Touro Infirmary, 520 So.2d 389 (La.1988), we recognized a hospital's strict liability arising out of the sale of defective blood, stating that "[t]he responsibility of a professional vendor or distributor is the same as that of a manufacturer." 520 So.2d at 391. [Emphasis added.]
The transfusions in DeBattista occurred in February of 1973, the plaintiff started experiencing symptoms approximately one month later, and she was diagnosed with Hepatitis B in April. We infer that the DeBattista plaintiff filed suit sometime prior to mid-1974 because there is no mention of any prescription issues being raised in either the Supreme Court opinion cited above, or in the appellate decision reported at 385 So.2d 518. Because of its status as the seminal case in this field[3] it is worth quoting at length:
In defining "fault" for purposes of products liability in Weber v. Fidelity & Cas. Co. of N.Y., 259 La. 599, 250 So.2d 754 (1971)[4], this court held:
"A manufacturer of a product which involves a risk of injury to the user is liable to any person, whether the purchaser or a third person, who without fault on his part, sustains an injury caused by a defect in the design, composition, or manufacture of the article, if the injury might reasonably have been anticipated. However, the plaintiff claiming injury has the burden of proving that the product was defective, i.e., unreasonably dangerous[5] to normal use, and that the plaintiff's injuries were caused by reason of the defect.
"* * *
"If the product is proven defective by reason of its hazard to normal use, the plaintiff need not prove any particular negligence by the maker in its manufacture or processing; for the manufacturer is presumed to know the vices in the things he makes, whether or not he has actual knowledge of them."[6]Id. 250 So.2d at 755-756.
Defendant blood bank contends that plaintiffs may not recover in tort under Weber because the blood was not defective, i.e., "unreasonably dangerous to *837 normal use,"[7] for three reasons: (1) The judgment of whether the product is "unreasonably dangerous[8] to normal use" must be based on the manufacturer's entire line or his total activity, rather than the single product used by plaintiff. (This is implicitly assumed by defendant, not expressly argued); (2) The social utility of the distribution of blood greatly outweighs the risk of its harm; and (3) Blood banks have no way of preventing distribution of the relatively small amounts of unwholesome blood that cause harm. In essence, defendant relies on an argument that the activity of distributing blood involves danger, but a reasonable danger which should be tolerated for its benefits, and that consumers must bear the cost of the inherent risks involved.
Defendant's arguments, however, misconstrue the "unreasonably dangerous"[9] limitation. These words were included within the definition of legal fault to prevent manufacturers from becoming insurers of their own products. "Unreasonably dangerous"[10] means simply that the article which injured the plaintiff was dangerous to an extent beyond that which would be contemplated by an ordinary consumer.
The history of strict liability in Louisiana indicates the requirement that a defective product must be "unreasonably dangerous" came into our jurisprudence due to the pervasive influence of section 402A of the Restatement (Second) of Torts after its publication in 1965.[11] Louisiana's law in the products liability area has been described by commentators as closely approximating that of common law states following the Restatement (Second) of Torts § 402A. See Andrus, Strict Liability Under Civil Code Articles 2317, 2318 and 2321: An Initial Analysis, 25 La.Bar J. 105 (1977); Robertson, Manufacturers' Liability for Defective Products in Louisiana Law, 50 Tul.L.Rev. 50 (1975). This view has also been taken by federal courts interpreting Louisiana law. See Perez v. Ford Motor Co., 497 F.2d 82 (5th Cir. 1974); Welch v. Outboard Marine Corp., 481 F.2d 252 (5th Cir.1973). After using the "unreasonably dangerous"[12] limitation in Weber as a condition to legal fault under Article 2315, this court employed a similar requirement in summarizing the principles of legal fault under Articles 2317, 2318, 2320, 2321, 2322. We held that strict liability results from the conduct or defect of a person or thing which creates an "unreasonable risk" of harm to others. Loescher v. Parr, supra.
Furthermore, this court in Loescher clearly expressed the underlying reason for the legal fault arising from these code provisions, sometimes referred to as strict liability:
"Thus, the person to whom society allots the supervision, care, or guardianship (custody) of the risk-creating person or thing bears the loss resulting from creation of the risk[13], rather than some innocent third person harmed as a consequence *838 of his failure to prevent the risk." Id., 324 So.2d [at] p. 446.
According to the original comment to Section 402A[14], a "defective condition" is one "not contemplated by the ultimate consumer, which will be unreasonably dangerous to him." Restatement (Second) Torts, § 402A comment g. Comment i[15], defining "unreasonably dangerous,"[16] states: "The article must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." See Welch v. Outboard Marine Corp., supra; Loyocano[Loyacano] v. Continental Ins. Co., 283 So.2d 302 (La.App. 4th Cir. 1973). A consumer expectation approach is particularly appropriate in Louisiana which has aligned itself with those jurisdictions showing particular concern for consumer interests. Media Production Consultants, Inc. v. Mercedes-Benz of North America, Inc., 262 La. 80, 90, 262 So.2d 377, 381 (1972). Examples given in comment i[17] make it clear that such innocuous products as sugar and butter, unless contaminated, would not give rise to a strict liability claim merely because the former may be harmful to a diabetic or the latter may aggravate the blood cholesterol level of a person with heart disease. Presumably such dangers are squarely within the contemplation of the ordinary consumer. Cronin v. J.B.E. Olson Corp., 8 Cal.3d 121, 104 Cal.Rptr. 433, 441, 501 P.2d 1153, 1161 (1972). Prosser, the reporter for the Restatement, suggests that the "unreasonably dangerous" qualification was added to foreclose the possibility that the manufacturer of a product with inherent possibilities for harm (for example butter, drugs, whiskey and automobiles) would become "automatically responsible for all the harm that such things do in the world." Prosser, Strict Liability to the Consumer in California, 18 Hastings L.J. 9, 23 (1966). We recognize that the words "unreasonably dangerous"[18] may serve the beneficial purpose of preventing the manufacturer from being treated as the insurer of its products. We conclude, however, that the term may be used only for this purpose, and certainly not to burden the injured plaintiff with proof of an element which rings of negligence. Otherwise, the formulation of strict liability in practice rarely would lead to a different conclusion than would have been reached under the laws of negligence.[19]Cronin v. J.B.E. Olson Corp., supra, 104 Cal.Rptr. at 442, 501 P.2d at 1162. See, Comment, 40 La.L.Rev. 207 (1979). Yet the very purpose of strict liability is to relieve the plaintiff from problems of proof inherent in pursuing negligence and warranty remedies, and thereby to insure that the costs of injuries resulting from defective things are borne by those responsible[20] for them. *839 See Loescher v. Parr, supra, at 446.[21] Courts in a number of jurisdictions abrogated the requirement that the defect be "unreasonably dangerous," concluding that requiring plaintiff only to prove the existence of a defect is more consistent with the policies giving rise to products liability initially and lessens the risk that negligence elements are injected into the plaintiff's case. E. g., Butaud v. Suburban Marine & Sporting Goods, Inc., 543 P.2d 209 (Alaska 1975); Cronin v. J.B.E. Olson Corp., supra; Glass v. Ford Motor Co., 123 N.J.Super. 599, 304 A.2d 562 (1973). In their view, the protective end of preventing the seller from becoming an insurer of his products is attained by the necessity of proving that there was a defect in the manufacture or design of the product[22] and that such defect was a proximate cause of the injuries. We have determined, nevertheless, that the requirement of an unreasonable risk as a condition to strict liability should be retained. It must be carefully applied, however, with its true purpose in mind.
Accordingly, we conclude that blood contaminated with hepatitis virus is defective, i.e., unreasonably dangerous to normal use. The risks involved in receiving a transfusion of blood in this condition are certainly greater than a reasonable consumer would expect. See, e. g., L. Frumer and M. Friedman, Products Liability s 16A(4)(f)(i) at pp. 3B-124, 126 (1980); 1 M. Dixon, Drug Product Liability s 9.08(4) at pp. 9-119 (1980); Boland, Strict Liability in Tort for Transfusing Contaminated Blood, 23 Ark.L.Rev. 236 (1969); Verlander, Article 2317 Liability: An Analysis of Louisiana Jurisprudence Since Loescher v. Parr, 25 Loy.L.Rev. 263, 268 (1979); Note, 71 Colum.L.Rev. 487 (1971); Note, 46 N.Y.U.L.Rev. 703 (1971).
Application of These Principles to the Present Facts
In the present case, plaintiffs proved (a) that the blood which Mrs. DeBattista received by transfusion was defective, i.e., unreasonably dangerous to normal use, (b) that it was a product which had been processed and distributed by the defendant blood bank, (c) that Mrs. DeBattista's injury might reasonably have been anticipated by one having actual or constructive knowledge of the defect, and (d) that Mrs. DeBattista's injuries were caused by reason of the defect. The defendants did not present any proof that the damage was caused by the fault of the plaintiffs. The blood bank, therefore, is liable to the plaintiffs.
DeBattista v. Argonaut-Southwest Insurance Company, 403 So.2d 26 (La.1981).
As is evident from the foregoing extensive quotation, DeBattista relies most on Weber v. Fidelity & Cas. Co. of N.Y., 259 La. 599, 250 So.2d 754 (1971) and the Restatement (Second) Torts, § 402A[23], with particular emphasis on the concept of "unreasonably dangerous." DeBattista's relentless reliance on this concept of "unreasonably dangerous" is significant when one recalls that something that is "unavoidably dangerous" is, by definition not "unreasonably dangerous."
*840 DeBattista contains several references to comments g and i under § 402A, but none to comment k. Comment k sets forth the "unavoidably dangerous" defense to strict liability. This Court strongly agrees with the need to consider comment k and the "unavoidably unsafe" defense suggested by the Supreme Court's remand in Seal v. St. Tammany Parish Hospital Service District No. 1, XXXX-XXXX (La.6/30/00), 765 So.2d 1057.
In Seal v. St. Tammany Parish Hospital Service District No. 1, XXXX-XXXX (La.6/30/00), 765 So.2d 1057, the Louisiana Supreme Court reversed the First Circuit "for the reason assigned by Judge Weimer in his dissenting opinion." In that dissenting opinion to the appellate decision, Judge Weimer said that:
[T]he defendants are entitled to present a defense relative to whether a blood transfusion, given in 1973, which is alleged to be the cause of plaintiff's Hepatitis C, was "unavoidably unsafe." See Restatement of Law of Torts (Second) Section 402(a), comment k. [Emphasis added.]
Seal v. St. Tammany Parish Hospital Service District No. 1, 2000 WL 1506082, 99-2914 (La.App. 1 Cir. 1/27/00), unpub.
Judge Weimer's dissent further noted that neither DeBattista nor Weber v. Fidelity & Cas. Co. of N.Y., supra, "squarely faced [the] issue" of whether a strict liability claim for blood tainted with Hepatitis could be subject to the "unavoidably unsafe" defense of comment k of Section 402(A) of the Restatement (Second) of Torts:
In DeBattista, the defendants contended that the danger presented by the blood was reasonable because the screening test used to detect Hepatitis B, a known contaminant, was not one hundred (100%) percent effective, and that this relatively small percentage of unwholesome blood which the test could not detect was not unreasonably dangerous in comparison to the larger amount of blood which had properly been screened given the social utility of blood. DeBattista, 403 So.2d at 30. This is a different argument than is being presented by defendants in the instant case, i.e., that blood is unavoidably unsafe, and thus not unreasonably dangerous, when it is contaminated by an unknown and undiscovered virus for which a screening test did not exist at the time of the transfusion. That the defendants' arguments in DeBattista were rejected should not be interpreted to foreclose all arguments in which the risk presented by blood is contended to be reasonable.
Seal, (La.App. 1 Cir. 1/27/00), unpub., supra.
We adopt Judge Weimer's reasoning as the original reasoning of this Court.
Doe v. Miles Laboratories, Inc., 927 F.2d 187, 191 (4 Cir.1991) suggests four criteria for determining whether a blood product is unavoidably unsafe and, therefore, not unreasonably dangerous: (1) the nonexistence of any scientific test capable of detecting the viral agent which contaminated the blood at the time of injury; (2) the great utility of the product; (3) the lack of any substitute for the product; and (4) the relatively small risk of the disease being transmitted by the product. We might add as a fifth factor in the instant case the fact that not only was there no scientific test capable of detecting the viral agent, Hepatitis C, in 1963, but the very existence of such a virus was unknown.
It is important to note from a policy perspective that the "unavoidably unsafe" defense does not defeat the purpose of strict liability. The policy driving strict products liability in this area according to Justice Dennis' opinion in Weber v. Fidelity *841 & Cas. Co. of N.Y. is "not to burden the injured plaintiff with proof of an element which rings of negligence" but to "relieve the plaintiff from problems of proof inherent in pursuing negligence and warranty remedies ..." The burden is on the defendant to show that its product is "unavoidably unsafe," which is completely consistent with the stated policy behind the concept of strict liability of freeing the plaintiff from the burden of proof, at least initially.
As noted by Justice Dennis in DeBattista, supra, the requirement for strict liability that a product be "unreasonably dangerous" did not enter Louisiana jurisprudence until after it was enunciated in the 1965 publication of the Restatement (Second) Torts, § 402A. The Hepatitis B in DeBattista was a known contaminant. The application of the "unavoidably unsafe" defense to the instant case is the logical outgrowth of Justice Dennis' reliance in DeBattista on the Restatement (Second), § 402A. Accordingly, we find that in 1963 the presence of Hepatitis C in Mrs. Chauvin's transfusion was an "unavoidably unsafe" condition for which Mercy Hospital cannot be held liable.

III. PLAINTIFFS' HAD NO STRICT LIABILITY CAUSE OF ACTION IN 1963.
Weber v. Fidelity & Cas. Co. of N.Y., the 1971 case relied upon so heavily in DeBattista, is significant because it marks the point at which the Louisiana Supreme Court adopted the strict products liability in tort theory reflected in Restatement (Second), § 402 A. Branch v. Willis-Knighton Medical Center, 92-3086 (La.4/28/94), 636 So.2d 211, 213. "Louisiana's first cause of action for products liability as such arose jurisprudentially from the Weber[24] case." Crawford, Louisiana Civil Law TreatiseTort Law, § 16.14 "Evolution of Products Liability in Louisiana," (2000), at p. 295.
The incident giving rise to the cause of action in Weber v. Fidelity & Cas. Co. of N.Y, exposure to excessive amounts of arsenic in a cattle spray, took place in August of 1963, contemporaneously with the blood transfusions of which plaintiffs' complain in the instant case. However, the defect giving rise to the Weber claim was man made and arose in the course of manufacture of the product, a defect that was apparently relative easy to prevent, i.e., the product in Weber was avoidably unsafe. The Hepatitis C in the instant case was an unpreventable, undetectable, and unknown phenomenon occurring naturally in a vital product, blood, that itself is a product of nature and for which no substitute or alternative existed. Louisiana did not recognize a cause of action for such naturally occurring, unknown blood-borne pathogens acquired through medically indicated transfusions in 1963.
Plaintiffs rely on the fact that the Branch[25] opinion traces some of the philosophy expressed in Weber back to Meche v. Farmers Drier & Storage Co., 193 So.2d 807 (La.App. 3d Cir.1967), in support of their contention that a strict products liability cause of action for Hepatitis C transmitted by blood transfusion existed as far back as 1963. In Meche the court said:
A manufacturer or seller of a product which involves a risk of injury to the user is liable to any person, whether the purchaser or a third person, who without fault on his part sustains an injury caused by a defect in the design or manufacture of the article, if the injury *842 might have been reasonably anticipated. Smith v. New Orleans & Northeastern Railroad Co., (La.App. 1 Cir.), 153 So.2d 533; Samaha v. Southern Rambler Sales, Inc., La.App. 4 Cir., 146 So.2d 29; Restatement of Torts 2d, Section 402(A) [FN3 omitted.]; Prosser, The Law of Torts, Chapter 19 (3d ed., 1964); 65 C.J.S. Negligence s 100(2). Cf. also: Percy, Products Liability Tort or Contract or What?, 40 Tul. L.Rev. 715 (1966); Note, TortsStrict Liability of the Manufacturer, 23 La. L.Rev. 810 (1963). [Emphasis added.]
Meche involved an elevator accident. Where the Meche court refers to a "defect in the design or manufacture of the article" it used the terms "design" and "manufacture" as more commonly understood and would not have extended them to cover unknown naturally occurring blood borne pathogens transmitted by blood transfusion. At that time such pathogens would never have been considered to be "defects in the design or manufacture" of the blood.
The 1967 Meche decision is probably the first in Louisiana to consider the implications for strict liability set forth in the Restatement (Second) Torts, § 402A. It was noted in 1966 that no court in Louisiana had addressed § 402A as of that date.
Louisiana courts have not had an opportunity to rule on a products case since the Second Restatement of Torts section 402-A was expanded to include products other than food.
The Emergence of Strict Liability in Products Cases, Note, 26 La.L.Re. 447 (1966), at p. 504.
The Louisiana Supreme Court's description of the landmark nature of DeBattista quoted earlier in this opinion from its most recent pronouncement in this area of the law in Williams v. Jackson Parish Hospital, 00-3170 (La.10/16/01), 798 So.2d 921, reinforces the conclusion of this Court that in 1963, no court in Louisiana would have recognized a Hepatitis C blood transfusion claim against Mercy Hospital. No Louisiana court in 1963 would have applied the casuistry that Mercy Hospital should be "presumed to know the vices in the things he makes" as per DeBattista. This rule of law originated in the theory that the manufacturer of the product also manufactured the defect and, therefore, should have known of the defect or should have corrected it. Mercy Hospital, even if we employ a legal fiction to describe it as the manufacturer of the transfused blood would not, in 1963, have been said to have manufactured the Hepatitis C virus in the blood. Nor would Hepatitis C have been considered analogous to tainted food cases where bacteria also occur naturally, because the theory behind the tainted food cases is that the food preparer can prevent the taint by using only fresh and wholesome ingredients:
The policy behind holding the manufacturer, but not a mere retailer, liable in the deleterious foodstuffs cases seems to be sound. The conclusive presumption of knowledge is based on the premise that the manufacturer in holding itself out as one skilled in its trade had represented that its product is not defective, and that the public has relied on this representation; it is supposed to know and will be held to have known. More important, responsibility may thereby be placed on the party in control of the purity of the foodstuff during the stage when the deleterious condition generally occurs. The manufacturer is in the best position to know and discover the defect in its product and to remove the defect from the product or the product from the market. With respect to retailers none of these considerations appears to be present, except *843 where the product is labeled [sic] as its own. The retailer, handling varied and numerous items of food and drink can hardly be expected to vouch for the wholesomeness of each. It normally has no control over the wholesomeness of the product for it has taken no part either in the selection of the raw materials or in the preparation of the finished product. Moreover, for these same reasons, the preventive factor does not seem to be a controlling consideration here as in the case of the manufacturer. [Emphasis added.]
Studies in Louisiana Torts Law, Excerpts from the first 29 Volumes of the Louisiana Law Review, Malone & Guerry, § IV, Liability of Manufacturers, Sellers, and Lessors of Goods, Liability for Damages Resulting from Consumption of Deleterious Foodstuffs in Louisiana, Comment, 22 La. L.Rev. 435 (1962), at p. 501. Mercy Hospital did not have control over the transfused blood "during the stage when the deleterious condition [Hepatitis C] occurs." Hepatitis C existed in the transfused blood prior to the time it was drawn and prepared for transfusion and Mercy Hospital had no means of knowing of its existence thereafter.
This quotation from the 1962 Comment shows that in 1962, even in the limited area of liability for deleterious foodstuffs, the courts of this state distinguished between the liability of the manufacturer and the seller, a line that became blurred later on, but which is another indication that in the early sixties the law of strict liability was not what it became later. See Meche v. Farmers Drier & Storage Co., 193 So.2d 807 (La.App. 3d Cir.1967), supra, and Shortess v. Touro Infirmary, 520 So.2d 389 (La.1988), infra.
Hepatitis C was unknown and was not preventable in 1963. Moreover, in 1963, Louisiana courts had not extended the rationale of foodstuff cases beyond that category of goods. In 1963, strict products liability still lay in the future.
A recent Louisiana case, though decided on the basis of negligence and though not using res ipsa loquitur, sets the standard of care so high as to admit of the possibility of reaching the result in Greenman [v. Yuba Power Products, Inc., 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 (1963)], in future product liability cases in Louisiana. [Emphasis added.]
Note, TortsStrict Liability of the Manufacturer, 23 La.L.Rev. 810 (1963).
Greenman, supra, a trailblazing California case, imposed strict liability in tort on the manufacturer of a power tool. The "recent Louisiana case," referred to in the Louisiana Law Review Note quoted from above is Samaha v. Southern Rambler Sales, Inc., 146 So.2d 29 (La.App. 4 Cir. 1962), a case cited by the plaintiffs in support of their contention that a strict products liability cause of action for Hepatitis C in blood transfusions existed in Louisiana in 1963. As pointed out in the Note, at that time no case in Louisiana had imposed strict liability on a manufacturer, and the prospect of strict liability for unknown and unknowable blood borne pathogens in transfused blood, such as the plaintiffs seek to have this court impose on Mercy Hospital in the instant case, was even more remote.
Samaha was rendered on September 4, 1962. Samaha, however, refers to manufactured defects that were "possible for [the manufacturer] to determine." Id., 146 So.2d at 32. This Court in Samaha went on to note that the "manufacturer is subject to rules much more strict than is the seller." Id., 146 So.2d at 33. However, Meche, unlike Samaha, was decided after the publication of Restatement (Second) of Torts, § 402A, and cites it. Meche places *844 the liability of the manufacturer and the seller on the same footing, also unlike Samaha, another indication that there has been a change in the law in Louisiana post Restatement (Second) of Torts, § 402A. See also Shortess v. Touro Infirmary, 520 So.2d 389 (La.1988), infra.
This reading of Meche and Samaha is consistent with the Supreme Court's latest pronouncement in this field to be found in Williams v. Jackson Parish Hospital, 00-3170 (La.10/16/01), 798 So.2d 921, where that Court explained, as noted already, that it was not until the 1981 decision in DeBattista that, "Louisiana became one of the handful of states that imposed strict liability on hospitals (as opposed to blood banks) for defective blood transfusion."
Smith v. New Orleans & N.E.R. Co., 153 So.2d 533 (La.App. 1 Cir.1963), cited in Meche and in the plaintiffs' brief, is likewise not a strict liability decision and may not be used as authority to impose liability on Mercy Hospital for the transfusions in the instant case. Smith involved allegations of a mechanical defect in an automobile resulting in injury. The Smith court, in affirming the dismissal of plaintiff's claims against General Motors for a defectively manufactured fuel pump, set forth the following standard:
As a general rule a manufacturer is under a duty to make an article carefully where its nature is such that it is reasonably certain to place life and limb in peril when negligently made, and he is liable to a third person for an injury resulting from a failure to perform this duty. [Emphasis added.]
Id., 153 So.2d at 539.
This standard of care described in Smith employs concepts of due care and negligence and consequently provides no support for plaintiffs' strict liability arguments.
Moreover, the legislature reacted quickly to overrule DeBattista:
Subsequently, the legislature added Civil Code article 2322.1 and R.S. 9:2797 granting physicians, hospitals and blood banks immunity from strict tort liability for screening, processing, transfusion or medical use of blood and blood components of any kind which results in transmission of viral disease undetectable by appropriate medical and scientific laboratory tests.[26]
Faucheaux v. Alton Ochsner Medical Foundation Hospital and Clinic, 470 So.2d 878 (La.1985).
In Faucheaux the question was whether the defendant hospital could be held liable for a contaminated transfusion administered in November of 1980. Neither the appellate decision, 468 So.2d 720 (La.App. 5 Cir.1985), nor the Supreme Court case cited supra, reveals the nature of the contamination. The appellate decision, which was reversed on other grounds, states that: "Prior to 1968, there is no reported case in which a recipient of defective blood prevailed against a blood provider on a theory of strict liability."[27] However, we have found no Louisiana cases ante-dating DeBattista, which as the Supreme Court explained recently in Williams, supra, was the first case recognizing such claims.
Shortess v. Touro Infirmary, 520 So.2d 389 (La.1988), involved a 1980 transfusion from which plaintiff contracted non-A/non-B Hepatitis, which the court described as being caused by an unknown agent for which there was no test available. Id., 520 So.2d at 390. The Shortess court held Touro liable under a theory of strict liability *845 citing DeBattista and overruling Weber v. Charity Hospital of La. at New Orleans, 487 So.2d 148 (La.App. 4 Cir.1986). The Shortess court did not consider the "unavoidably unsafe" defense. The Shortess court also cited Toups v. Sears, Roebuck and Co., Inc., 507 So.2d 809 (La. 1987), Faucheaux v. Alton Ochsner Medical Foundation, 470 So.2d 878 (La.1985), and Chappuis v. Sears Roebuck & Co., 358 So.2d 926 (La.1978).
Toups is not supportive of plaintiff's position because it arises out of injuries sustained by the plaintiff in 1980 in connection with a defective water heater. Although there is strict liability language in the case, the real issues were those of failure to provide adequate warnings of danger and the failure to adopt a safer alternative design. In 1963, there was no warning available for the unknown and unknowable Hepatitis C, and there was no alternative to a blood transfusion.
In Chappuis the plaintiff's claim was based on a failure to warn that it was unsafe to use a hammer once it became chipped in spite of the fact that there was no showing of any defect in the manufacture. It was found that the manufacturer knew of this danger and that all of the experts agreed that the danger existed. Thus, Chappuis is best characterized as a failure to warn of a recognized and known danger in a manufactured product resulting in an injury in 1972. This case does not support a strict liability cause of action against a hospital arising in 1963 for an unknown and unknowable naturally occurring blood borne pathogen for which no warning was possible and when no alternative to the transfusion existed.
Shortess undermines plaintiffs' reliance on Samaha to support their contention that strict liability existed as early as 1963 for transfusions under the facts of this case. In Shortess the court held, as it did in Meche, that: "The responsibility of a professional vendor or distributor is the same as that of a manufacturer." Id., 520 So.2d at 391. This is inconsistent with Samaha where this Court stated unequivocally that:
As a rule, the law governing the obligations of the manufacturer and dealer or seller in such a case is not the same. The relation of vendor and vendee is governed by different legal principles from those applicable to the manufacturer and the person who purchases his products, relying implicitly upon its representations to the public as to the high character of material and workmanship employed in the construction of such product. The manufacturer is subject to rules much more strict than is the seller. [Emphasis added.]
Id., 146 So.2d at 33.
This is just another indication that real substantive changes in the area of strict products liability occurred jurisprudentially subsequent to the 1963 transfusions that are the focus of the instant case.
Although the blood shield laws were not in effect in 1963, they do express the public policy of this state as expressed by the electorate through their elected representatives in the legislature. Moreover, the blood shield laws were enacted in quick response to what our survey of the jurisprudence shows was a single groundbreaking case DeBattista. Prior to DeBattista there were no cases imposing such liability. Such few cases as there were prior to DeBattista uniformly rejected such liability. Martin v. Southern Baptist Hospital, 352 So.2d 351 (La.App. 4 Cir.1977); Juneau v. Interstate Blood Bank, Inc., of Louisiana, 333 So.2d 354 (La.App. 3 Cir. 1976); Koppenol v. St. Tammany Parish Hospital, 341 So.2d 1242 (La.App. 1 Cir. 1976); Adams v. New Orleans Blood-Bank, *846 Inc., 343 So.2d 363 (La.App. 4 Cir. 1977). See also Tufaro v. Methodist Hospital, Inc., 368 So.2d 1219 (La.App. 4 Cir. 1979).
Not only is it obvious that no 1963 Louisiana court would have afforded the plaintiff a strict liability cause of action under the facts of this case, it is equally certain that the legislature would have opposed such claims because when DeBattista made the great leap forward it was promptly overruled by the legislature.
Accordingly, there is no public policy to be advanced by affording retroactive relief to the plaintiffs under the facts of this case:
In determining whether or not our decision should be given retroactive effect, three factors should be considered: (1) the decision to be applied non-retroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed; (2) the merits and demerits must be weighed in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective application will further or retard its operation; and (3) the inequity imposed by retroactive application must be weighed. Chevron Oil Company v. Huson, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971).
Lovell v. Lovell, 378 So.2d 418, 421-422 (La.1979).
Regarding these Lovell factors we can be certain that in 1963 no one in a position truly analogous to that of the plaintiffs in the instant case would have had any expectation of a right to a claim or cause of action. Moreover, had Mercy Hospital had any reasonable reason to believe that it had such exposure to the unknown and unknowable back in 1963, who knows what steps they might have taken to limit or eliminate that exposure. Therefore, by refusing to extend strict liability back to 1963 under the facts of this case we cause no unfairness to the plaintiffs and probably prevent unfairness to Mercy Hospital. The principles of strict liability upon which the plaintiffs rely represented a clear change in the law, unforeseeable as regards unknown and unknowable blood borne pathogens in 1963. Finally, by refusing to push this theory of liability back to 1963 we further the public policy of this state as expressed in the blood shield statutes; and there is no basis for the plaintiffs to argue that the public policy of this state in 1963 would have favored their claims. Accordingly, having viewed the facts of this case through the lens of the Lovell factors, we find that the principles set forth in DeBattista and Williams should not be applied retroactively back to 1963.
For the foregoing reasons, we find that courts of this state would not have afforded the plaintiffs a cause of action in 1963, and there is no public policy reason to do so today.

IV. PLAINTIFFS' CLAIMS FOR NEGLIGENCE, LOSS OF CONSORTIUM AND FEAR HAVE NO MERIT.
Regardless of whether we adopt the finding in Turnage v. Columbia Lakeside Hospital, 98-1263 (La.App. 5 Cir. 3/30/99), 731 So.2d 919, 922 to the effect that knowledge of Hepatitis C does not antedate 1975, or whether we adopt the chronology of medical science advances in the 1980's and 1990's described in footnote No. 5, in Williams, supra, we find that there can be no negligence on the part of Mercy Hospital. There can be no negligence where a product, such as the blood in the instant case, is found to be unavoidably unsafe. *847 Therefore, we sustain and affirm the decision of the trial court to dismiss plaintiffs' negligence claims. Accordingly, we also sustain and affirm the trial court's decision to dismiss plaintiffs' loss of consortium and fear claims.
As we find that in 1963 there was no cause of action against a hospital for infection with Hepatitis C arising out of a blood transfusion and that where Hepatitis C is concerned, blood transfusions in 1963 were "unavoidably unsafe," we do not reach the other issues raised by the litigants.
For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.
NOTES
[1] The issue in Williams was one of prescription. Our reading of Williams indicates that plaintiffs in cases like the instant case could defeat an exception of prescription if they could make a contra non valentem showing.
[2] Emphasis added.
[3] See Williams v. Jackson Parish Hospital, 00-3170 (La.10/16/01), 798 So.2d 921, where it is described as such by the Supreme Court.
[4] Emphasis added.
[5] Emphasis added.
[6] This precept arises from the fact that the manufacturer creates the vice when he creates the manufactured product. However, the blood in the instant case was not manufactured by Mercy and the vice therein, Hepatitis C, was also not created by Mercy.
[7] Emphasis added.
[8] Emphasis added.
[9] Emphasis added.
[10] Emphasis added.
[11] Emphasis added.
[12] Emphasis added.
[13] Emphasis added. This is another poor analogyMercy did not "create" the risk in this case as that term would normally be understood.
[14] Emphasis added.
[15] Emphasis added.
[16] Emphasis added.
[17] Emphasis added.
[18] Emphasis added.
[19] Emphasis added.
[20] It is difficult to see how Mercy Hospital could be "responsible" for the Hepatitis C in this case. Mercy did not manufacture the blood, it did not manufacture the Hepatitis C with which it may have been contaminated, and it had no way of detecting it or supplying an alternative to this vital product. This Court finds analogies to manufactured products very strained under the facts of this case.
[21] Emphasis added.
[22] Emphasis added. Again, this Court finds analogies to manufacturing and design flaws to be very strained where blood is a natural substance necessary to life. Any Hepatitis C found in it under the facts of this case would be naturally occurring. The Hepatitis C is not a by-product of the process of preparing the blood for transfusion.
[23] § 402A as noted in DeBattista was not published until 1965. 403 So.2d at p. 30.
[24] Weber v. Fidelity & Cas. Ins. Co. of New York, 259 La. 599, 250 So.2d 754.
[25] Supra.
[26] Emphasis added.
[27] Emphasis added.